DC COMICS, INC., Plaintiff,

v.

FILMATION ASSOCIATES, Defendant.

No. 78 Civ. 5508 (LFM).

United States District Court,
S. D. New York.

March 21, 1980.

Shea & Gould by Jesse Climenko and Richard L. Spinogatti, New York City, Cooper, Epstein & Hurewitz by Michael A. Painter, Beverly Hills, Cal., Pryor, Cashman, Sherman & Flynn by Gayle A. Yeomans, New York City, for defendant.

Cowan, Liebowitz & Latman, P. C. by Roger L. Zissu and Louis S. Ederer, New York City, for plaintiff.

## OPINION

MacMAHON, Chief Judge.

This case shows that a lawsuit need not assume the shape of a class action in order to qualify as a Frankenstein monster.[1] It poses many difficult questions in the form of defendant's post-trial motions for judgment notwithstanding the verdict, Fed.R. Civ.P. 50(b), and for a new trial, Fed.R. Civ.P. 59(a), and in plaintiff's prayer for equitable relief. Before turning to these questions, a brief outline of the litigation is necessary.

Since 1941, plaintiff, a New York corporation, has marketed comic books using the *Aquaman* characters. *Aquaman* is an underwater hero, who, with his female companion *Mera*, fights against the villain *Black Manta* and assorted forces of evil. Since 1967, *Aquaman* has had a loyal walrus-like companion, *Tusky*.

Since 1967, plaintiff has marketed from time to time an *Aquaman* animated television series, created by defendant pursuant to a contract, and from 1973 plaintiff has exhibited over the ABC television network its own animated *Super Friends* series which includes *Aquaman* segments. Plaintiff also licenses others to market toys and games based on some of the Aquaman characters.

Since 1967, plaintiff has marketed comic books using the *Plastic Man* character. *Plastic Man*, a crime-fighter, has the ability to stretch and assume the shape of inanimate objects that retain the color and design of his costume. Since September 1979, plaintiff has exhibited a *Plastic Man* animated series over the ABC television network.

---

1. *Cf. Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 572 (2d Cir.) (Lumbard, C. J., dissenting).

Defendant, a Nevada corporation having its principal place of business in California, makes live and animated television film series, sometimes for its own account and sometimes for others, including plaintiff. In 1967, defendant created the *Aquaman* series for plaintiff under a contract. In 1976, plaintiff granted defendant an option to produce a live or animated *Plastic Man* show, but defendant never exercised the option.

In September 1978, defendant began exhibiting over the CBS television network two animated series which are the subject of this lawsuit—*Manta and Moray* and *Superstretch*, both as part of the *Tarzan and Super Seven* show. Exhibition continues today. Defendant also licenses others to market toys and games based on the *Manta and Moray* and *Superstretch* series.

*Manta* is an underwater hero. *Moray* is his female companion. *Whiskers* is their walrus-like companion.

*Superstretch* has essentially the same abilities as *Plastic Man*. In addition he has a wife, *Microwoman*, and a pet dog, both of whom often accompany him on his adventures.

In 1978, plaintiff brought this action for damages and equitable relief, claiming that defendant's series violate various rights under state and federal law. Plaintiff presented four theories of liability for each of defendant's two series: trademark infringement under § 43(a) of the Lanham act;[2] unfair competition under New York law; breach of contract; and breach of confidential relationship.[3]

A jury trial was held on October 17, 18, 19, 22 and 30, resulting in a verdict of liability for plaintiff on seven of its eight claims, and verdicts finding special compensatory damages on the *Aquaman* claims in the amount of $389,091.75, and special compensatory damages on the *Plastic Man* claims in the amount of $817,765.50.

Defendant, now represented by new counsel, seeks judgment notwithstanding the verdict on all verdicts favorable to plaintiff, or in the alternative, a new trial. Plaintiff seeks an injunction, an accounting, destruction of defendant's films and underlying materials, and attorney's fees.

## I. LEGAL CONTENTIONS.

Defendant argues that it is entitled to judgment as a matter of law on claims 1 through 4 because they fail to state claims upon which relief can be granted.[4] We disagree.

### A. Scope of the Lanham Act.

Plaintiff's claims 1 and 2 are based on § 43(a) of the Lanham Act,[5] enacted by Congress in 1946. Plaintiff contends that the Act protects its characters, including all their traits and abilities, from copying and imitation by others. Defendant asserts that the scope of the Act is much narrower since it was directed primarily at false advertising and palming off through the use of misleading packaging, labeling or naming of the product sold. Defendant claims that since its series were not designed to be

---

**2.** 15 U.S.C.A. § 1125(a).

**3.** The complaint and amended complaint alleged three claims for each series. Plaintiff's requested jury instructions showed that its third and fourth claims rested on two theories each: breach of contract and breach of confidential relationship. Accordingly, we sent eight claims to the jury: Lanham Act (claims 1 and 2); unfair competition (claims 3 and 4); breach of contract (claims 5 and 6); breach of confidential relationship (claims 7 and 8).

**4.** Prior to trial, defendant moved for summary judgment on claims 1 and 2 on the same ground. We denied the motion substantially for the reasons set forth here. At trial, defend-

ant moved for dismissal of claims 1 through 4 and for a directed verdict on those claims on the same ground. We provisionally denied the motions and reaffirm our rulings here.

**5.** Section 43(a) provides in relevant part:

"Any person who shall . . . use in connection with any goods or services . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter commerce . . . shall be liable to a civil action . . . ." 15 U.S.C. § 1125(a).

palmed off as originating in plaintiff, it cannot be liable under the Act.

■ We think that defendant's interpretation of the original legislative intent is largely correct and that plaintiff's remedy more properly lies under the Copyright Act.[6] Nevertheless, our reading of the cases in this circuit shows that where the product sold by plaintiff is "entertainment" in one form or another, then not only the advertising of the product but also an ingredient of the product itself can amount to a trademark protectable under § 43(a) because the ingredient can come to symbolize the plaintiff or its product in the public mind.[7]

Protectable "ingredients" recognized in this circuit include the names and nicknames of entertainment characters,[8] as well as their physical appearances[9] and costumes,[10] but not their physical abilities[11] or personality traits.[12] The failure of any court so far to grant Lanham Act protection for character traits or abilities makes sense since it is difficult to see how such intangible qualities, having an infinite number of possible visible and audible manifestations, can achieve that fixture or consistency of representation that would seem necessary to constitute a symbol in the public mind.

■ In short, we think that, as construed in this circuit, the Lanham Act, though not as broad as plaintiff would have it, is not as narrow as defendant contends. Thus, defendant is not entitled to judgment as a matter of law on claims 1 and 2.

B. *Preemption.*

Defendant argues that preemption doctrine precludes relief on claims 1 through 4. First, defendant argues that plaintiff is barred from proceeding under the Lanham Act because it failed to assert claims under the federal Copyright Act.[13] This contention lacks merit. It appears to be based on the so-called "*Sears-Compco* doctrine of copyright and patent preemption."[14] But *Sears-Compco* and their progeny, which dealt with the extent to which federal patent and copyright laws limit the power of the states to grant protection in those areas, are inapposite to claims predicated on a federal statute, because the federalism concerns underlying *Sears-Compco* are simply not implicated by such claims. Moreover, the Copyright Act itself explicitly allows remedies under other federal statutes even where the scopes of the statutes overlap.[15] Thus, the Copyright Act does not bar claims 1 and 2.

■ Defendant next argues that the Copyright Act bars claims 3 and 4, which

---

6. 17 U.S.C. §§ 101–810. *See Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 754–55 (9th Cir. 1978), *cert. denied*, 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 94 (1979).

7. *See, e. g., American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir. 1979) (word "Bionic" in television show); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979) (cheerleader uniform); *Ideal Toy Corp. v. Kenner Prods. Div.*, 443 F.Supp. 291 (S.D.N.Y.1977) (physical appearance of robot and villain characters in "Star Wars" movie).

8. *See, e. g., American Footwear Corp. v. General Footwear Co., supra* ("bionic" man and woman); *Geisel v. Poynter Prods., Inc.*, 283 F.Supp. 261 (S.D.N.Y.1968) ("Dr. Seuss"). *Cf. DC Comics, Inc. v. Powers*, 465 F.Supp. 843 (S.D.N.Y.1978) (name of newspaper in plaintiff's comic book series); *National Lampoon, Inc. v. American Broadcasting Cos.*, 376

F.Supp. 733 (S.D.N.Y.1974) (name of plaintiff's magazine).

9. *Ideal Toy Corp. v. Kenner Prods. Div., supra.*

10. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., supra.*

11. *Booth v. Colgate-Palmolive Co.*, 362 F.Supp. 343, 349 (S.D.N.Y.1973) (alternative holding).

12. Plaintiff has cited no case, and we have found none, holding that physical abilities or personality traits are protectable under § 43(a) of the Lanham Act.

13. 17 U.S.C. §§ 101–810.

14. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

15. 17 U.S.C. § 301(d).

are based on the New York law of unfair competition. We disagree for two reasons. First, since New York law, unlike the Copyright Act, requires a showing of misappropriation of economic value and a likelihood of public confusion,[16] it is saved from preemption because it protects a right that is "not equivalent" to any right granted by the Act.[17] Second, the parties stipulated that defendant began the creation of its two television series prior to 1978.[18] Thus, the action is saved as a "cause of action arising from undertakings commenced before January 1, 1978." [19]

## II. *SUFFICIENCY OF THE EVIDENCE.*

Defendant contends that, as to the seven findings of liability and the two verdicts on damages, the evidence was so meager that defendant is entitled to judgment,[20] or at least to a new trial.[21] We will consider each of these contentions in order.

### A. *Liability.*

■ 1. *Judgment notwithstanding the verdict.*—On a motion for judgment notwithstanding the verdict under Rule 50(b), we must view the evidence in the light most favorable to plaintiff and give plaintiff the benefit of all reasonable inferences that may be drawn in its favor. We may not grant the motion unless reasonable people could only have found for defendant.[22]

■ Applying this standard to the findings of liability on claims 1 through 4 and 6 through 8, we hold, after a review of the trial testimony and exhibits, that the evi-

dence was sufficient to support the verdicts on claims 1 through 4, 6 and 8. Accordingly, we deny the motion for judgment notwithstanding the verdict as to liability on those claims.

■ As to claim 7, however, we reach a different result. Claim 7 alleged that defendant, in making the *Manta and Moray* series and exhibiting it over CBS starting in September 1978, breached a confidential relationship dating from 1967, the year that defendant created the *Aquaman* series for plaintiff. In order to establish liability, plaintiff had to prove that it gave defendant secret materials or information to be used by defendant for plaintiff's benefit, that defendant used the material or information for its own benefit, and that this conduct injured plaintiff.[23]

On the first element, there was evidence that in 1967, plaintiff furnished defendant with secret scripts and music and that plaintiff's employee, Ducovny, had the right to work with defendant to make sure that the animation produced by defendant maintained the integrity of plaintiff's characters.[24] There was no evidence, however, that Ducovny imparted any secret knowhow or expertise to defendant, or indeed that he had any expertise in the craft of animation. There was thus support only for a finding that a confidential relationship existed with respect to the scripts and music.

There was no evidence from which the jury could infer that defendant used the

---

**16.** *See Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774 (2d Cir. 1964); *Ideal Toy Corp. v. Kenner Prods. Div., supra.*

**17.** 17 U.S.C. § 301(b)(3).

**18.** Tr. 386, 392–93.

**19.** 17 U.S.C. § 301(b)(2).

**20.** Fed.R.Civ.P. 50(b).

**21.** Fed.R.Civ.P. 59(a).

**22.** *C-Suzanne Beauty Salon, Ltd. v. General Ins. Co.*, 574 F.2d 106, 112 n.10 (2d Cir. 1978); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.

1970). Although as to the state law claims it remains an open question whether a New York or federal standard applies, we will apply the federal standard in the absence of a suggestion that a different result would obtain under New York law and in light of the parties' assumption that the federal standard governs. *C-Suzanne Beauty Salon, Ltd. v. General Ins. Co., supra.*

**23.** *Flexitized, Inc. v. National Flexitized Corp., supra*, 335 F.2d at 782; *Robine v. Ryan*, 310 F.2d 797 (2d Cir. 1962); *Spiselman v. Rabinowitz*, 270 A.D. 548, 61 N.Y.S.2d 138 (1946).

**24.** Tr. 33, 36, 141, 164, 445, 494.

secret scripts and music in the creation of *Manta and Moray* in 1977 and 1978. Mr. Scheimer, defendant's president, testified that all the material used in connection with the *Aquaman* film project was returned to plaintiff well before the creation of *Manta and Moray*.[25] Even if the jury disbelieved Scheimer, plaintiff failed to put on evidence that would support a finding of unlawful use. As to the scripts, Mr. Harrison, plaintiff's president, admitted that he knew of no story lines furnished by plaintiff to defendant that were used in *Manta and Moray*.[26] As to the music, the record is silent. Plaintiff, having the burden of proof, cannot succeed without at least some showing that the music used in *Manta and Moray* resembles that furnished by plaintiff. Finally, as noted above, since there was no showing that Ducovny furnished any secret expertise to defendant, it follows that defendant could not have used any to the detriment of plaintiff.

In short, the evidence suggests only that defendant relied solely upon its own expertise and plaintiff's comic books. Such copying, though actionable as unfair competition, does not amount to that abuse of a confidential relationship that is necessary to support the verdict of liability on claim 7.

Accordingly, we grant judgment notwithstanding the verdict on claim 7.

■ 2. *New trial.*—On a motion for a new trial under Rule 59(a), defendant must show that the weight of the evidence was so plainly against plaintiff that the jury reached a "seriously erroneous result" tantamount to a "miscarriage of justice."[27] We have reviewed the evidence thoroughly and find it sufficient to support the six verdicts of liability as to which we denied the motion for judgment notwithstanding

the verdict. We do not think that any of these verdicts was "seriously" erroneous.

As to claim 7, as stated above, we think that the evidence in favor of plaintiff was so scant as to require the granting of judgment for defendant. A new trial would be fruitless.

### B. *Damages.*

■ 1. *Claims 1, 3, 5 and 7.*—On the claims relating to *Manta and Moray*, the jury found special compensatory damages of $389,091.75, based apparently on a conclusion that plaintiff lost potential profits from sales of entertainment products involving the *Aquaman* characters. Viewing the evidence in the light most favorable to plaintiff, we think that it does not support a finding of damages.

a. *Actual confusion.*—At the outset, we note that the evidence supported findings of liability only on claim 1 for violation of the Lanham Act and claim 3 for unfair competition.[28] Next, we note that our Court of Appeals has recently reaffirmed the longstanding rule in this circuit that in cases alleging violation of the Lanham Act and the New York law of unfair competition, plaintiff cannot recover damages without proof that consumers who wished to buy plaintiff's product were actually misled into buying defendant's, or at least that consumers were actually confused as to the origin of the products.[29]

Although plaintiff demonstrated a likelihood of consumer confusion, plaintiff did not prove actual confusion. Plaintiff did not suggest, nor would the suggestion have been credible, that any networks or toy and game licensees were confused as to source of origin. Plaintiff put on no evidence as to the reactions or attitudes of purchasers or

---

25. Tr. 446.

26. Tr. 135.

27. *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir. 1976).

28. The jury found for defendant on claim 5, which alleged breach of contract. We granted

the defendant judgment notwithstanding the verdict on claim 7, which alleged breach of confidential relationship.

29. *Perfect Fit Indus., Inc. v. Acme Quilting Co.,* 618 F.2d 950, 955 (2d Cir. 1980); *G. H. Mumm Champagne v. Eastern Wine .Corp.,* 142 F.2d 499, 501 (2d Cir. 1944).

users of toys and games, or of purchasers or readers of comic books.[30]

Harrison did testify to one case of actual confusion. A woman told him, in a chance meeting, that her children enjoyed watching plaintiff's new programs on CBS; in fact, the CBS programs were defendant's.[31] We do not think that a single, isolated incident such as this suffices to support an inference of actual confusion of the viewing public in general, or of the audience for comic books and toys and games. Indeed, it does not even support an inference that the viewers, as opposed to their mother, were confused, because it may well be that interested youngsters watch cartoons with a more discriminating eye than their parents.[32]

b. *Damages in fact.*—Moreover, plaintiff failed to put on evidence from which the jury could reasonably infer that defendant's conduct caused injury in fact to plaintiff's sales and licensing programs.

Harrison's admission that *Aquaman* segments have been and are now being broadcast over the ABC television network [33] belies plaintiff's assertion that it has been unable to obtain network exposure since the advent of *Manta and Moray* in September 1978. While plaintiff did show that it has not obtained network exposure of a full-length, half-hour *Aquaman* program, the evidence did not support a reasonable inference that this failure is attributable to defendant's conduct. The 1967 *Aquaman* show has been relegated to syndicated, regional telecasts since 1973, a full five years before the conduct of which plaintiff complains.[34] Moreover, there was no suggestion that plaintiff tried to sell the 1967 show to a network at any time after defendant's wrongful conduct. The only rea-

sonable inference is that the 1967 series failed to gain network exposure in 1978 and 1979 not because of any wrongdoing by defendant, but because the show was obsolete and hence undesirable to a network, or because plaintiff, recognizing this, had voluntarily withdrawn the show from the network market, or because ABC's decision to exhibit *Aquaman* segments nationally as part of *Super Friends* had saturated that market.

█ Finally, there was no evidence that plaintiff tried to work up a new *Aquaman* show and sell it to a network. Plaintiff argues that the absence of such an attempt does not defeat the inference of damages since it can always be inferred that the advent of defendant's infringing product foreclosed potential markets. But in the cases relied upon by plaintiff, the complaining party was engaged in an ongoing effort to sell its product that was frustrated by defendant's conduct.[35] Here, by contrast, there is no evidence that plaintiff was trying to sell an *Aquaman* series, as opposed to isolated segments, in the national network market at any time after 1973. Though juries are traditionally allowed considerable latitude in determining the amount of damages, the test is more stringent as to the fact of damages.[36] Plaintiff has failed that test with respect to television profits.

There was no evidence that licensing of *Aquaman* characters decreased in 1978 or 1979. To the contrary, Mr. Grant, president of the corporation ("LCA") that acts as plaintiff's licensing agent, testified that licensing of all of plaintiff's characters has been increasing steadily over the years and that *Aquaman* had been licensed continu-

---

**30.** See *Perfect Fit Indus., Inc. v. Acme Quilting Co., supra*; *Ideal Toy Corp. v. Kenner Prods. Div., supra*, 443 F.Supp. at 308.

**31.** Tr. 169.

**32.** Cf. *Archie Comic Publications, Inc. v. American News Co.*, 204 Misc. 1060, 125 N.Y.S.2d 919, 921 (Sup.Ct.1953) (comic book characters), *aff'd*, 283 App.Div. 868, 129 N.Y.S.2d 915 (1954).

**33.** Tr. 26.

**34.** Tr. 386.

**35.** See, e. g., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); *Richfield Oil Corp. v. Karseal Corp.*, 271 F.2d 709, 712 (9th Cir. 1959).

**36.** *Id.* at 711.

ously up to the time of trial.[37] Though there was evidence that toy companies have paid over $1,300 to defendant for merchandising rights to the *Manta and Moray* characters,[38] there was no suggestion that these payments resulted from actual confusion among licensees or consumers as to the source of defendant's characters.[39]

Harrison did testify that sales of *Aquaman* comic books decreased by 74,952 copies in 1978.[40] But proof of any causal link between this decline and the advent of *Manta and Moray* was exceedingly spare. First, Harrison admitted that the decline could trace to any number of factors, such as consumer buying trends.[41] Second, there was no indication of what portion of the decline, if any, occurred after the first airing of *Manta and Moray* in September 1978, the earliest date at which the show could have harmed plaintiff's comic books sales. Third, there was no showing that defendant's television show confused potential purchasers of plaintiff's comic books into refraining from buying them. Had defendant sold competing comic books, an inference of confusion and switchover might reasonably be drawn. But absent any evidence suggesting an overlap of television and comic book markets, or showing that television shows starring one group of characters can affect sales of comic books featuring a second set of characters, we think that the jury was unwarranted in attributing any sales decline to defendant.

It is thus our conclusion that on claims 1 and 3 plaintiff did not make out a case for damages. Accordingly, we grant judgment notwithstanding the verdict on the issue of damages as to those claims.

2. *Claims 2, 4, 6 and 8.*—On the claims relating to *Superstretch*, the jury found special compensatory damages of $817,-765.50. We think that there was evidence to support a finding of damages, but that this amount is seriously excessive.

▮▮▮ a. *Actual confusion.*—The sole evidence of actual confusion consisted of Harrison's anecdote of the confused mother. Thus, plaintiff was not entitled to damages on claim 2, based on the Lanham Act, or claim 4, based on the New York law of unfair competition.[42]

▮▮▮ b. *Damages in fact.*—Nevertheless, there was evidence to support the inference that defendant directly harmed plaintiff by preventing plaintiff from having a *Plastic Man* series sold to a network for the 1978–1979 season. The jury could have inferred that from late 1977 onward, plaintiff was attempting to conclude such a sale, that it gave defendant an option to try to effect the sale, and that during the option period defendant developed its own similar *Superstretch* show and sold it to the CBS television network for the 1978–1979 season. The fact that plaintiff did sell a *Plastic Man* show, through a third party, to the ABC television network for the 1979–1980 season further supports the inference that it could have achieved a network sale a year earlier but for defendant's conduct. Thus, plaintiff was entitled to damages on claim 6 for breach of contract, and claim 8 for breach of confidential relationship, because on neither of these claims is plaintiff required to prove actual consumer confusion.

In addition to finding lost television profits, the jury could also have concluded that defendant's breaches caused plaintiff to forego substantial licensing revenue, be-

37. Tr. 181–83.

38. *E. g.*, Ex. 94.

39. Pointing to testimony that the absence of full-length network exposure of *Aquaman* adversely affected its licensing program, plaintiff asserts that the jury could reasonably have attributed an even greater amount to lost licensing profits. But since we hold that plaintiff's failure to gain network exposure could not reasonably be attributed to defendant's con-

duct, it follows that lost licensing profits flowing from that failure cannot be attributed to defendant either.

40. Tr. 24.

41. Tr. 136.

42. *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, supra.

cause Gray testified that network television exposure has a direct salutary effect on licensing.[43]

Harrison testified that *Plastic Man* comic books sales were declining as early as 1977.[44] There was no basis for inferring that the advent of *Superstretch* caused a further decline. Thus, no damages were properly attributable to comic book sales.

**c. Amount of damages.**—In determining what amounts the jury could reasonably have attributed to lost television and licensing profits, we are guided by two principles. On the one hand, we must realize that proof of damages in these kinds of cases is extremely difficult because by necessity it requires an estimation of profits that did not come to fruition. Moreover, since defendant has occasioned the harm, it must bear the risk of uncertainty as to what the lost profits might have been.[45] On the other hand, we must not tolerate a verdict plainly based on sheer speculation and guesswork. The jury must have a reasonable basis for its calculations.[46]

In measuring lost television profits, the jury could properly have considered several factors. One was the amount defendant would have paid to plaintiff—about $40,000—[47] had defendant exercised the option to produce a *Plastic Man* show and attempt to sell it to CBS.

Second, the jury could have considered what would have happened had defendant timely informed plaintiff that CBS was uninterested in the *Plastic Man* show. The evidence showed that for the 1979–1980 season, plaintiff, in return for about $188,000, granted to Ruby-Spears Productions the rights to produce *Plastic Man* segments and

sell them to the ABC television network.[48] The jury thus could have concluded that absent defendant's misconduct, plaintiff could have made a similar arrangement for 1978–1979. Though plaintiff failed to show its costs in obtaining this deal, the costs were probably negligible since plaintiff was merely procuring the sale of intangible rights.

Third, the jury could properly have considered profits to defendant from its sale of the competing *Superstretch* program to CBS for 1978–1979. There was evidence that defendant's revenues were $1,087,000 for two seasons.[49] Half of this, or $543,500, is logically attributable to the 1978–1979 season. There was no evidence as to defendant's costs, however, and these were manifestly substantial since defendant had to produce each show.[50] Plaintiff could have discovered this evidence, and we do not think that it should profit from its own sloth.

While in an accounting for profits defendant has the burden of showing its costs,[51] we think that in an action for damages plaintiff has the burden of discovering those facts that will give the jury a reasonable basis for estimating damages. This is precisely what the plaintiff did in the case chiefly relied on by plaintiff here.[52] Since there was no evidence as to defendant's costs, we conclude that using its sales as a basis for estimating its profits would have led the jury to improper speculation. Accordingly, taking into account the amount paid by Ruby-Spears to plaintiff for 1979–1980 and adding a premium to reflect a diminution in value stemming from defendant's unlawfully gaining the market a year

---

**43.** Tr. 184.

**44.** Tr. 79–80.

**45.** *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946).

**46.** *Id.*

**47.** Ex. 38.

**48.** Tr. 124–26; Exs. 68, 94.

**49.** Exs. 87, 94.

**50.** We may infer from the other evidence at trial that production costs were entailed in the conception and drawing of characters, the creation of story lines and scripts, and the animation of the episodes.

**51.** *See Brandon v. Regents of Univ. of Cal.*, 441 F.Supp. 1086, 1090 (D.Mass.1977).

**52.** *Flexitized, Inc. v. National Flexitized Corp.*, *supra*, 335 F.2d at 778.

earlier, we think that $200,000 is the maximum that a jury could reasonably have awarded for lost television profits.

On merchandising, the evidence shows that defendant's licensing revenues were $1,339.[53] Its costs were probably minimal in granting these rights.

Further, Grant testified that, because of interest spurred by the national television broadcasts of *Plastic Man*, between ten and twenty licensees will pay LCA between $2,000 and $150,000 each in royalties on *Plastic Man* for 1979–1980.[54] This yields an expected range of $20,000 to $3,000,000 that plaintiff might have gained a year earlier but for defendant's conduct.

This testimony is doubly speculative, however, in that it is based only on prospective estimates by licensees who may well be overly optimistic, and the number of possible licensees and the amounts of their prospective royalty payments are so uncertain as to be arbitrary. Moreover, there was no testimony as to how much of any payment from a licensee to LCA ultimately goes to plaintiff.

In spite of all these problems, we reiterate that proof of damages is difficult and that defendant must bear the risk of uncertainty. To deny any damages from lost licensing profits would force plaintiff to wait until figures on 1979–1980 licensing were available and then to bring a second lawsuit using those figures to prove the amount of damages. This delay would serve neither the administration of justice nor plaintiff's interest in prompt recovery for the wrongs suffered.

In sum, we think that $21,339 in lost licensing profits was the most proven without speculation, based on defendant's sales of $1,339 plus a conservative view of Grant's estimates: ten licensees at $2,000 each.

Plaintiff argues that the damages from lost profits should be augmented by an amount attributable to harm to plaintiff's goodwill. We disagree.

The jury was empowered to compensate such harm through a verdict of general compensatory damages, but it chose only to compensate direct economic loss through special compensatory damages. This choice was the jury's province. It was fully supported by the evidence that plaintiff's television and licensing programs were successful in 1979–1980, thus negating the inference of harm to goodwill.

Nor do we think that the jury committed harmless error that did not affect substantial rights.[55] In the cases relied upon by plaintiff, the jury either obviously filled in the wrong blank on the verdict form[56] or misconstrued an ambiguous form.[57] Here, however, the verdict form was unambiguous, and we would denigrate the jury's ability to follow instructions were we to conclude that it meant to award damages for loss of goodwill as well as lost profits but filled in the wrong blank.

Based on television losses of $200,000 and licensing losses of $21,339, we think that the jury could have awarded at most $221,339 in special compensatory damages as to the claims based on *Superstretch*. Accordingly, we will grant defendant's motion to set aside the verdict of damages as excessive and order a new trial limited to the damage issue unless plaintiff, within ten days, stipulates to a reduction to $221,339.[58]

## III. OTHER ARGUMENTS FOR NEW TRIAL.

Defendant contends that the verdict for defendant on claim 5 finding no breach of contract is inconsistent with the verdict for

---

**53.** Ex. 94.

**54.** Tr. 188.

**55.** Fed.R.Civ.P. 61.

**56.** *E. g., Smith v. Philadelphia Transp. Co.*, 173 F.2d 721, 727 (3d Cir. 1949); *Vizzini v. Ford Motor Co.*, 72 F.R.D. 132, 139 (E.D.Pa.1976).

**57.** *Dupaquier v. Employers Cas. Co.*, 34 F.R.D. 7, 8 (E.D.La.1963).

**58.** *See Comiskey v. Pennsylvania R.R.*, 228 F.2d 687, 688 (2d Cir. 1956).

plaintiff on claim 7 finding breach of confidential relationship, thus requiring a new trial on those claims.[59] Inasmuch as we have found the verdict for plaintiff on claim 7 unsupported by the evidence, resolution of this point is unnecessary since defendant now has judgment on both claims. In any event, the verdicts were reconcilable. The jury could have found that any contractual duty not to compete against plaintiff expired before any fiduciary duty arising from a confidential relationship.

■ Defendant next contends that plaintiff's counsel, Mr. Zissu, repeatedly and egregiously implied wrong law to the jury during his summation, thus infecting the jury deliberations and making a fair verdict impossible.[60] It is certainly true that, though Mr. Zissu was fully aware that we would charge the jury that a federal trademark cannot exist in the physical abilities of characters,[61] he repeatedly stressed to the jury the similarities in physical abilities among the various characters. This he did even after being interrupted several times by the court and warned that this was not the law.[62]

We think, however, that his conduct did not infect the jury's deliberations. First, we interrupted him and gave a curative instruction several times.[63] Defendant's citation of *Koufakis v. Carvel*,[64] where the court failed timely to intervene, is thus off point. Second, our charge, delivered immediately after the tainted summation, made it clear that the jury was not to consider physical abilities in its determination of the Lanham Act claim.[65] We think that this

adequately countered Mr. Zissu's comments.[66]

## IV. *EQUITABLE RELIEF.*

### A. *Attorneys' Fees.*

■ The application for attorneys' fees and costs is denied because the defense was plainly not interposed in bad faith. Nor do overriding considerations of justice warrant an allowance.[67]

### B. *Accounting.*

In the absence of proof of actual confusion of consumers, plaintiff is not entitled to an accounting on its claims based on the Lanham Act and unfair competition (claims 1 through 4).[68] Accordingly, since plaintiff established liability for *Manta and Moray* only on theories of Lanham Act violation and unfair competition, it is not entitled to an accounting for the profits from that series.

On plaintiff's claims of breach of contract and confidential relationship based on *Superstretch* (claims 6 and 8), however, we may, in our discretion, order an accounting to compensate plaintiff where damages in the form of lost profits are not sought or are difficult to prove, or to deter defendant from repeated wrongdoing in the future.[69] Since an accounting would serve neither of these goals, we decline to order it.

First, plaintiff did seek damages in the form of lost profits. Though these were admittedly difficult to prove, we think that the verdict returned by the jury, modified

**59.** *See, e. g., Bernardini v. Rederi A/B Saturnus*, 512 F.2d 660, 662, 664 (2d Cir. 1975).

**60.** *See Bellows v. Dainack*, 555 F.2d 1105, 1108 (2d Cir. 1977); *Koufakis v. Carvel*, 425 F.2d 892, 900 (2d Cir. 1970).

**61.** Tr. 522.

**62.** Tr. 560–63, 568, 578.

**63.** Tr. 560–62.

**64.** *Supra*, 425 F.2d at 901.

**65.** Tr. 616–17, 625–26.

**66.** *Berner v. British Commonwealth Pac. Airlines, Ltd.*, 346 F.2d 532, 542 (2d Cir. 1965).

**67.** *Scotch Whisky Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 813–14 (7th Cir. 1973); *le Cordon Bleu, S.A. v. BPC Publishing Ltd.*, 451 F.Supp. 63, 71 (S.D.N.Y.1978).

**68.** *Perfect Fit Indus., Inc. v. Acme Quilting Co., supra*, 955.

**69.** *Monsanto Chemical Co. v. Perfect Fit Prods. Mfg. Co.*, 349 F.2d 389 (2d Cir. 1965); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219, 1241–42 (D.Colo.1976), aff'd, 561 F.2d 1365 (10th Cir. 1977).

by the analysis above, included compensation for any profits that plaintiff might have lost because of defendant's conduct. Any further monetary relief would be redundant.

Second, an accounting is neither necessary nor desirable to deter future misconduct. The nature and extent of defendant's contractual and fiduciary duties with respect to plaintiff's *Plastic Man* character and series were matters on which reasonable people could well differ. Moreover, in the realm of artistic endeavor, first amendment values counsel us to shrink from deterring a maximum flow of creations into the market place. To make an award having a solely punitive purpose might well chill legitimate imaginative work without preventing clearly unlawful conduct.

#### C. *Injunction.*

Plaintiff, having received favorable jury verdicts on the questions of liability on its unfair competition and Lanham Act claims, ·is entitled to an injunction.[70]

#### D. *Destruction of Materials.*

Absent any showing of bad faith or intention not to comply with this opinion and the ensuing decree, we think that delivery and destruction of the offending materials is unnecessary.

### V. *CONCLUSION.*

To summarize:

(1) Defendant's motion for judgment notwithstanding the verdict pursuant to Rule 50(b), Fed.R.Civ.P., on the issue of liability is denied as to claims 1, 2, 3, 4, 6 and 8.

(2) Defendant's motion for judgment notwithstanding the verdict pursuant to Rule 50(b), Fed.R.Civ.P., on the issue of liability is granted as to claim 7.

(3) Defendant's motion for a new trial pursuant to Rule 59(a), Fed.R.Civ.P., on the issue of liability is denied as to claims 1, 2, 3, 4, 6, 7 and 8.

(4) Defendant's motion for judgment notwithstanding the verdict pursuant to Rule 50(b), Fed.R.Civ.P., on the issue of damages on claims 1, 3 and 7 is granted.

(5) Defendant's motion for judgment notwithstanding the verdict pursuant to Rule 50(b), Fed.R.Civ.P., on the issue of damages on claims 2, 4, 6 and 8 is denied. ·

(6) Defendant's motion for a new trial pursuant to Rule 59(a), Fed.R.Civ.P., on the issue of damages on claims 2, 4, 6 and 8 will be granted unless plaintiff, within ten (10) days, stipulates to a reduction of such damages to $221,339.

(7) Plaintiff's application for attorneys' fees and costs, an accounting for profits, and destruction of defendant's materials is denied. ·

(8) Plaintiff's application for an injunction is granted.

The parties are directed to settle a form of judgment and decree within ten (10) days.