**TAMBRANDS, INC., Plaintiff,**

v.

**WARNER–LAMBERT COMPANY and J. Walter Thompson U.S.A., Inc., Defendants.**

No. 86 Civ. 7122 (MGC).

United States District Court, S.D. New York.

June 29, 1987.

Debevoise & Plimpton by Robert J. Geniesse, Bruce P. Keller, Marion W. Payson, New York City, for plaintiff.

Skadden, Arps, Slate, Meagher & Flom by Kenneth A. Plevan, Miriam L. Siroky, Colm J. Dobbyn, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

This case involves advertising claims for home pregnancy test kits ("Kits"). Tambrands, Inc. ("Tambrands") filed a complaint against defendants Warner–Lambert Company ("Warner–Lambert") and J. Walter Thompson U.S.A., Inc. ("Thompson") alleging that defendants' advertising violated the Lanham Act, 15 U.S.C. § 1125 (1982 & West Supp.1987),[1] and sections 349 and 350

1. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in relevant part:

of the New York General Business Law (McKinney 1968 and West Supp.1987). Defendants asserted counterclaims alleging that Tambrands' advertising violated the same statutory provisions. Tambrands requested damages and preliminary and permanent injunctive relief, and defendants sought a declaratory judgment and injunctive relief.[2] With the consent of the parties, the preliminary and permanent injunction hearings were consolidated, and a bench trial was conducted on the merits. The parties explicitly waived a jury trial on the damage claims. This opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. FACTUAL BACKGROUND

Tambrands is a Delaware corporation with its principal place of business in Lake Success, New York. Tambrands manufactures, markets and distributes feminine hygiene products, cosmetics, and over-the-counter diagnostic products. (Stipulated Facts, ¶ 2). Since July 1985, Tambrands has marketed Kits under the name "First Response."

Thompson, a Delaware corporation with its principal place of business in New York City, is an advertising agency that helped Warner–Lambert develop the challenged advertising. (Stipulated Facts, ¶ 4).

Warner–Lambert is a Delaware corporation with its principal place of business in Morris Plains, New Jersey. Warner–Lambert manufactures, markets and distributes prescription and non-prescription health care and other consumer products. (Stipulated Facts, ¶ 3).

In 1985, Warner–Lambert marketed Kits under the name "E.P.T. Plus" ("Original E.P.T. Plus"), (Stipulated Facts, ¶ 3), and began marketing Kits under the name

"New E.P.T. Plus." The challenged advertising is principally for the latter product, which is a version of the former product. Tambrands, Warner–Lambert, and several other companies directly compete in the Kit market.

Kits permit women to determine if they are pregnant by analyzing their urine to detect the presence of human chorionic gonadatropon ("HCG"), a hormone which appears in the urine and blood of pregnant women shortly after a fertilized ovum is implanted. (Stipulated Facts, ¶ 5). "Sensitivity," which is measured in milli International Units per milliliter ("mIUs/ml"), is the minimum concentration of HCG at which a particular Kit is designed to function reliably and accurately, and to produce a visible chemical reaction. (*See* Poirier Tr. at 212–13).[3] First Response has a laboratory sensitivity of 50 mIUs, and advertises the product for use on the expected day of menses ("Day Zero"). (Stipulated Facts, ¶ 11). Warner–Lambert claims a sensitivity of 150 mIUs/ml for New E.P.T. Plus, and claims that the product can be used on Day 1. (Def. Contentions of Fact, ¶¶ 12, 27, 29). The parties agree, for purposes of this action, that menses occurs on the fifteenth day after ovulation. (Fox Tr. at 89–90).

First Response, which uses a technology that differs from that used in New E.P.T. Plus, reacts to the presence of HCG in the urine by changing the color of a Kit solution from clear to blue. (Fox Tr. at 16). If the solution remains clear, the test is negative, i.e., the user tests as not pregnant. Tambrands claims that on Day Zero, First Response can produce positive and negative results within twenty minutes.

New E.P.T. Plus reacts to the presence of HCG in the urine by a gradual reduction

[a]ny person who shall affix, apply or annex or use in connection with any goods ... any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action by any person ... who believes that he is or is likely to be damaged by the use of any such false description or representation.

**2.** At trial, the parties agreed that laches and unclean hands were no longer at issue. Defendants had raised these affirmative defenses to the claims in the complaints, and Tambrands had raised these affirmative defenses to the counterclaims.

**3.** References to "Tr." accompanied by a name and page number are to the transcript of the trial testimony of the named witness.

of the color of a Kit solution from a deep red to a lighter pink or grey. (Clark Tr. at 680–81). New E.P.T. Plus indicates a non-pregnant result by no perceptible lightening in the color of the solution. The performance characteristics of New E.P.T. Plus and the manner in which defendants advertised them are disputed.

## II. DISCUSSION

■ If an advertising claim is literally, explicitly or unambiguously false on its face, a court may enjoin the defendant from disseminating or otherwise using the claim, regardless of the claim's effect on the consuming public. *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir.1982); *Vidal Sassoon, Inc. v. Bristol Meyers Co.*, 661 F.2d 272, 277 (2d Cir.1981); *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356 (S.D.N.Y.1976). *See also Cuisinarts, Inc. v. Robot–Coupe Int'l Corp.*, No. 81 Civ. 731 (S.D.N.Y. June 9, 1982) (finding that "material statements in the ad are facially false" "by necessary implication;" and, "the ad does not make the [facially false] statements in haec verba.")

The principal advertising claim which plaintiff challenges is the claim that "in as fast as ten minutes" or "as soon as 10 minutes" a user will know for sure whether she is pregnant. This claim, which is stated in many variations throughout defendants' advertising,[4] is accompanied by several other advertising sub-claims about which plaintiff complains, including the claims that New E.P.T. Plus is a one-step test, is the fastest test or fastest one-step test, and can be used on Day 1 in ten minutes.

### In As Fast As Ten Minutes

Tambrands argues that this claim for New E.P.T. Plus is "explicitly" and "unambiguously" false because it states that New E.P.T. Plus is a ten-minute test, when in fact negative results cannot be confirmed until thirty minutes have elapsed. Tambrands contends that New E.P.T. Plus is, in truth, a thirty-minute test.

More than half of the women who purchase Kits want to know that they are not pregnant. (Akin Tr. at 450). It is not seriously disputed that a non-pregnant woman who takes the New E.P.T. Plus test will not know for certain within ten minutes that she is not pregnant. Defendants concede that non-pregnant women require thirty minutes to know for sure that they are not pregnant, regardless of the day on which they perform the test. Any pregnant or non-pregnant woman using the test must confirm the results at thirty minutes if no color change occurs within ten minutes. (Clark Tr. at 624).[5]

Defendants argue that "positive results are generally, though not always, obtainable in 10 minutes," and rely on a 1985 study conducted by Warner–Lambert ("Study"). (Def. Post-Trial Br. at 12). This Study was conducted among nineteen pregnant women enrolled in fertility clinics in the Cincinnati area to determine the number of days after ovulation on which the women could obtain positive results with New E.P.T. Plus, and the time it took for the results to be obtained on a particular day. (Clark Tr. at 635, 636, 692–93). The Study was also designed to substantiate New E.P.T. Plus' performance claims. (Clark Tr. at 635). Each woman was required to record the time it took her to obtain positive results with New E.P.T. Plus on consecutive days from Day 1 through Day 12 or until she obtained positive results in five minutes or less. On Day 1, twelve of the nineteen women (approximately 63%) received accurate readings within thirty minutes that they were pregnant. Only ten of the nineteen women

---

4. Defendants advertised the challenged claims in national television commercials, print advertisements in consumer and professional publications, press releases, package copy, package inserts, and selling sheets distributed to Warner–Lambert's sales force.

5. Defendants suggested that all negative results could be learned within ten minutes, because a true negative result is as accurate at ten minutes as it is at thirty minutes. (*See* Clark Tr. at 694–95; Akin Tr. at 613–14). This argument is frivolous in light of defendants' warnings, *e.g.*, that "to verify negative results, the test should be rechecked at 30 minutes." (Pl. Ex. 3).

(approximately 52%) obtained positive results in ten minutes or less on Day 1. (Akin Tr. at 500). Two of the women tested as positive in ten to thirty minutes. The remaining seven women (approximately 37%) received false readings that they were not pregnant. (*See* Akin Tr. at 499).

Defendants argue that the ten-minute claim is "true on its face since the overwhelming majority of women who use E.P.T. Plus will in fact obtain accurate results in 10 minutes, even on Day 1." (Def. Memo in Response to Pl. Pre–Trial Memo, Nov. 20, 1986 at 4). Defendants' advertisements in fact suggest that the "overwhelming majority of women" will receive accurate results within ten minutes on Day 1. Warner–Lambert's own Study, in which only ten of nineteen, or 52%, received accurate results within ten minutes on Day 1, refutes this claim.

■ The questionable statistical validity of the Study is not important because the results of the Study do not support defendants' claims. Approximately 48% of the pregnant women in the Study did not receive accurate test results in ten minutes. This finding does not adequately support defendants' assertion that the vast majority of women will know for sure within ten minutes. The pregnant 48% as well as the 100% of non-pregnant women who cannot be sure until thirty minutes have passed, lead me to conclude that the New E.P.T. Plus test is not a ten-minute test as defendants' represent, but a thirty-minute test. Defendants' ten-minute claim is thus false and misleading. The falsity is not eliminated by defendants' attempt to qualify the ten-minute claim with the phrases "as early as" and "positive results." In many of the advertisements, defendants do not even use the modifier "positive" when referring to results.

Defendants' advertisements are facially false in that they state by necessary implication that New E.P.T. Plus is a ten-minute test, when in fact the test requires at least thirty minutes for most women to obtain accurate test results. *See Cuisinarts, Inc. v. Robot–Coupe, Int'l Corp.*, No. 81 Civ. 731 (S.D.N.Y. June 9, 1982). I find that the thrust of defendants' advertisements is false, and that even the qualifying words added to the advertising copy do not sufficiently modify the message to render the advertisements true.

*Ten Minutes on Day 1*

Defendants argue that the claim that "EPT Plus provides results on Day 1" (Def. Post–Trial Br. at 8) "is true on its face." (Def. Post–Trial Br. at 10). Plaintiff argues that the ten-minute claim is not true on any day, particularly on Day 1. Defendants argue that "since the vast majority of women use [Kits] on Day 7 or later, virtually all E.P.T. Plus users will get positive results in 10 minutes or less." (Def. Post–Trial Br. at 7). Although a Day 7, ten-minute linkage of positive results might be accurate, defendants' advertising does not suggest a link between Day 7 and ten minutes. On the contrary, defendants chose to link ten minutes and Day 1. Defendants' "10 minute" claim fails when it stands alone, and it cannot stand when coupled with a Day 1 qualifier. Even the Study, which showed that 48% of the pregnant women did not receive accurate test results within ten minutes, directly refutes this linkage claim. This claim is therefore false.

*One–Step Claim*

In virtually all of their advertising material, defendants state that New E.P.T. Plus is a one-step test. Defendants argue that this advertising claim is accurate "since, although [New E.P.T. Plus] involves several manipulations, there is only one chemical reaction in one test tube." (Def. Post–Trial Br. at 11). Plaintiff argues that "one-step" as used by defendants refers to the number of manipulations, of which there are plainly more than one.

At least one of defendants' advertisements draws a distinction between the number of manipulation steps of New E.P.T. Plus and its competitors. This advertisement, which appeared in professional journals, states "*1 step vs. 5 steps,*" and it continues "e.p.t. plus is the only color-change test that can be performed in one simple and convenient step. The dipstick test takes five steps, which can increase

the chances of the patient invalidating the test."

■ Though defendants compare the one-step nature of the test to the multiple manipulations of other products, they insist that "one-step" refers to one chemical reaction and not to manipulations of New E.P.T. Plus. Furthermore, defendants acknowledge that they used different definitions of the term to mean different things in different contexts. It is clear, however, that only one of the "one-step" definitions applies to New E.P.T. Plus, and that is *not* in the context of manipulations, but in the context of a chemical reaction. For these reasons, I find that the one-step claim is facially false when used in a context that pits defendants' one-step chemical reaction claim against the manipulation steps of other products. Defendants have agreed "to discontinue characterizing competitive kits as involving a specific number of steps, such as five steps." (Def. Post–Trial Br. at 2, note). But, this qualifier alone will not correct the inaccuracy of this claim. The only reasonable manner in which to cure this misleading use of "one-step," short of discontinuing use of the phrase, is for defendants to use an appropriate modifier such as "only one chemical reaction required" or "only one chemical step." Precise counting of manipulation steps shows that plaintiff's test requires a greater number of steps than defendants', but both tests require more than one manipulation.

### Fastest

■ Advertising for New E.P.T. Plus often contains the message that the product is the fastest test or the fastest one-step test. This statement is clearly misleading because the thirty minutes required for negative results makes New E.P.T. Plus slower, not faster than other tests on the market, including First Response, which require less than thirty minutes for accurate positive and negative results.

Furthermore, defendants argue that "New E.P.T. Plus is the fastest one-step test because it is the *only* one-step test." (Def. Contentions of Fact, ¶ 4). This argument is disingenuous because the clear implication of the claim is that New E.P.T. Plus is the fastest test.

### Permanent Injunction

■ In order to justify the issuance of a permanent injunction, plaintiff must show irreparable injury. Proof that defendants' advertising is false will sustain a finding of irreparable injury. *See Coca–Cola Co. v. Tropicana Products*, 690 F.2d 312 (2d Cir. 1982). Because it is difficult to establish actual damages in a competitive market, legal remedies in cases such as this are often inadequate.

■ The First Amendment permits courts to enjoin false commercial speech only to the extent necessary to prevent consumer confusion. Disclaimers are preferred over blanket proscriptions of speech. *Consumers Union v. General Signal Corp.*, 724 F.2d 1044, 1053 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *see also Upjohn Co. v. American Home Products, Corp.*, 598 F.Supp. 550, 561 (S.D.N.Y.1984). However, a disclaimer, modification or qualifier is appropriate only if it effectively turns an otherwise false advertising claim into a true one, in such a manner that the consumers are not misled. From the evidence adduced at trial, and the post-trial submissions, I find that defendants' added disclaimers and suggested modifications will not make defendants' false ten-minute claims true. However, with the modifications described above, defendants' misleading "one-step" claim can be made more accurate.

Defendants have agreed to modify their advertising claims in three ways. First, they have agreed to modify slightly the texts of two television commercials for New E.P.T. Plus. These changes do not render the contents of the commercials truthful. For example, in the modified fifteen-second commercial, the emphasized phrase *"10 MINUTES"* appears in large print on the face of the product box at least three times, in precisely the same manner as in the original fifteen-second commercial. The large letters and numbers of *"10 MINUTES"* continue to dwarf the smaller letters of "positive results as early as."

The modified commercial continues to emphasize the false ten minutes, rather than the accurate thirty minutes. The added voice that states "no color change in thirty minutes means you're not" does not sufficiently temper the ten-minute claim to render the advertisement truthful. The modified version of defendants' thirty-second commercial contains similar deficiencies.

Second, defendants have agreed that "[f]uture EPT Plus print advertisements stating that positive results are available in as fast as ten minutes will likewise indicate in a prominent location, in proximity to a reference to ten-minute results, that no color change in 30 minutes signifies that the user is not pregnant." (Def. Post-Trial Br. at 2, note). This modification will not effectively cure the falsity of the advertisements for reasons similar to those discussed above with respect to the television commercials. It is sufficient to note that the volunteered modification is carefully tailored to call for only one mention of the thirty-minute negative result language regardless of the number of times that the phrase "ten minutes" appears in the advertisements; and it would only apply to advertisements that specifically refer to "positive results" as opposed to those that refer to "results" "in as fast as ten minutes." Finally, "in the professional print advertisement challenged by Tambrands, Warner-Lambert agrees to discontinue characterizing competitive kits as involving a specific number of steps, such as five steps." *Id.* This modification is insufficient to cure the deficiencies in the one-step claim for the reasons discussed above.

██ I find that defendants' disclaimers or modifications to the false advertisements will not adequately correct the false claims. Therefore, I conclude that a permanent injunction is warranted in this case.

### Damages

To recover damages, Tambrands first "must establish actual consumer confusion or deception resulting from the violation." *See PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 271 (2d Cir.1987) (citing *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981); *DC Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1279 (S.D.N.Y.1980)). A plaintiff may show actual consumer confusion "through the use of direct evidence, *e.g.,* testimony from members of the buying public, as well as through circumstantial evidence, *e.g.,* consumer surveys or consumer reaction tests." *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., supra,* 818 F.2d at 266, 271, (2d Cir.1987). Then, after making this showing, "the quantum of damages, as distinguished from the entitlement, must be demonstrated with specificity," *id., Burndy Corporation v. Teledyne Industries, Inc.,* 748 F.2d 767, 771 (2d Cir.1984), even though "a court may engage in some degree of speculation in computing the *amount* of such damages." *Burndy, supra,* 748 F.2d at 771. However, "causation must first be established." *Id.*

### Consumer Confusion

██ The primary trial evidence proffered by Tambrands to show consumer confusion was a consumer survey, which Tambrands commissioned in conjunction with this litigation, and testimony about the survey by an expert witness. Even if Tambrands met the first prong of showing actual consumer deception, it has not met the second prong of the damages test.

### Actual Damages

First Response entered the national market in July 1985, and was first shipped in August 1985. Tambrands began advertising First Response in October 1985. New E.P.T. Plus entered the national market in December 1985, and consumer advertising for it began in early 1986.

. The evidence offered in support of plaintiff's claim that it lost sales because of defendants' false advertising shows that for the first half of the twelve months in which First Response was marketed, its actual sales exceeded the company's sales projections, and that for the second half of that year, the projections exceeded actual sales.

In December 1985, the same month in which New E.P.T. Plus entered the market,

Tambrands formulated "projections" of market share and sales of First Response for each two-month period from September/October 1985 through July/August 1986. The September/October 1985 "projections" were not in fact projections, but actual figures, because the sales and market share figures for those two months were available to Tambrands. (Fox Tr. at 121).

Tambrands' witnesses testified that from September 1985 to February 1986, Tambrands' actual sales exceeded projected sales by 3,300 cases; and that from March to August 1986, actual sales fell 4,800 cases below Tambrands' projections, representing approximately $450,000 in "lost revenues." Tambrands contends that through the end of December 1986, assuming a continuing proportional decline in market share, Tambrands "lost" an additional 4,700 cases in sales representing $425,000 in "lost revenues." Tambrands suggests that the sales it "lost" were diverted, at least in part to New E.P.T. Plus, as evidenced by the fact that "[b]etween November/December 1985 and July/August 1986, the total E.P.T. Plus actual market share jumped 13.4 share points from 15.5 to 28.9." (Pl. Post–Trial Br. at 55).

At the heart of Tambrands' damage evidence are its projections of sales and market share. These projections are insufficient to show that Tambrands suffered monetary loss caused by defendants' violation.

Tambrands offered sparse evidence to show that its projections were reliable, were based upon nonerroneous assumptions, were calculated using a methodology that is appropriate, or were based on anything more than pure speculation. *See, e.g., Foxtrap, Inc. v. Foxtrap, Inc.,* 671 F.2d 636, 642 (D.C.Cir.1982). To explain the origination of the projections, Mr. Fox testified that Ms. Zweirs, the product manager of First Response, actually compiled the projections. He testified:

> In trying to forecast into the future what we could expect in the way of market share growth, the product manager pulled together these [projection] charts

[Ex. 20–A] a year ago in December, 1985. It was her forecast that the share would build across the year as it is shown on page 4 of [Ex. 20–A].

(Fox Tr. at 119). Tambrands offered no other explanation, including any by the product manager who did not even testify at trial, as to the method by which Tambrands developed its projections, or the basis of the figures estimated. The projections are unconvincing and insufficient to support a reasonable conclusion that the difference between "expected" and actual sales was in fact a loss of revenue caused by defendants' advertising of New E.P.T. Plus. Tambrands offers no sound reason for relying on the projections as a basis for calculating actual damage.

Furthermore, the projections do not appear to take into account the rapidly changing nature of the Kit market. Mr. Fox testified that the projections for 1986 took into account the "possibiity" that a new product would enter the market in the fall of 1986. However, more than one other new Kit entered the market during 1985 and 1986, including E.P.T. Plus. (*See* Akin Tr. at 600). There is no evidence that the projections took into account that the market itself would grow as quickly as it did during the period. Plaintiff argues that no other Kit superior to First Response entered the market place during this period, and that First Response's sales should thus have increased in accordance with its projections. But apart from advertising, New E.P.T. Plus is a competitive product in terms of its ease of manipulation. No credible evidence was adduced that the challenged advertisements, as opposed to other forces at work in this complex market—including the increased market unit sales in the market from 85,000 to 194,000 units in this period—resulted in Tambrands' failure to reach its dubious projections.

The Nielsen reports show that the market share of New E.P.T. Plus increased as the share of First Response declined during the second half of the first year that First Response was marketed. But the shifts in the market shares of the two products were not proportional, i.e., New E.P.T.

Plus' rise was not matched by an equal decline in First Response's share. And a number of other new Kits entered the market. Tambrands admits that a portion of New E.P.T. Plus' market stemmed from cannibalization of older E.P.T. Kits still distributed by Warner–Lambert. (Fox Tr. at 170–71).

### Defendants' Counterclaims

The first of Tambrands' allegedly false advertising claims appeared on inserts in packages of Tambrands' products, and stated that First Response is "three times more sensitive than *any* other home test," and can be used "3 to 9 days earlier than other home pregnancy tests. (Marked Pleadings: Counterclaims and Amended Answer ("Counterclaims")). Defendants contend that this claim is false because "several home pregnancy tests can give results as early as First Response or within one day and are equally accurate." *Id.*

Plaintiff has stopped using the "3 to 9 days" earlier claim because it is no longer accurate. Because I have no reasonable expectation that plaintiff will begin to use this advertising claim again, this issue is moot. *See McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 523 (S.D.N.Y.1980).

■■■ Furthermore, the evidence adduced at trial does not support a conclusion that the "three times more sensitive" claim is false or misleading. At best, the evidence showed that other Kits *claimed* to be as sensitive as First Response, a claim that if truthful would render Tambrands' claim false. But, insufficient evidence was presented to show that these other Kits were in fact as sensitive or more sensitive than First Response. (*See, e.g.*, Covell Tr. at 408–10; *see also* Def. Post–Trial Br. at 47). Therefore, defendants have failed to carry their burden with respect to this claim.

The second of defendants' challenges is that Tambrands falsely claims that First Response "gives you the results earlier and faster than any other home pregnancy test." (Counterclaims, at ¶ 5(b)). Defendants charge that this claim is false and misleading because "E.P.T. Plus can give a positive result in as fast as ten minutes, a full ten minutes faster than FIRST RESPONSE." (Counterclaims, at ¶ 5(c)).

■■■ I do not find plaintiff's claim to be facially false. And since defendants offered no evidence that consumers were deceived or confused by this claim in plaintiff's advertising, defendants have failed to carry their burden with respect to this claim.

Defendants' third counterclaim challenges Tambrands' assertion that First Response "takes just 20 minutes from start to finish." Defendants argue that First Response "generally takes longer than 20 minutes to complete including waiting and manipulation time." *Id.* I do not find this claim of Tambrands to be facially false, although it may be misleading.

■■■ The trial evidence was insufficient to show that consumers were deceived or confused by this claim of Tambrands. Thus, defendants failed to carry their burden with respect to this claim.

■■■ Finally, defendants challenged Tambrands' comparisons of " 'new generation' tests like 'FIRST RESPONSE' which utilize 'breakthrough technology' to achieve superior results, with 'older generation tests,' which do not perform as well [including] 'another type of color change test where a slight lightening of color occurs.' " (Counterclaims, at ¶ 5(d); *see also* Def. Post–Trial Br. at 47). Defendants believe that "consumers will understand [this claim] to be a reference to E.P.T. Plus" and that it "falsely describes E.P.T. Plus as an inferior, older generation test allegedly having the shortcomings in performance attributed to said tests." (Counterclaims, at ¶ 5(d)). Because of its ambiguity, the language of this advertising may be misleading. But it was not shown to be unequivocally false on its face.

### Attorneys' Fees and Costs

■■■■ The parties agree that an award of attorneys' fees is appropriate "in exceptional cases," *e.g.*, where the violations are deliberate, willful, malicious, or fraudulent. *Cuisinart, Inc. v. Robot–Coupe Int'l Corp.*, 580 F.Supp. 634, 640 (S.D.N.Y.1984); *Vuitton et Fils, S.A. v.*

*Crown Handbags,* 492 F.Supp. 1071 (S.D. N.Y.1979), *aff'd without opinion,* 622 F.2d 577 (2d Cir.1980). The evidence adduced at trial leads me to conclude that this is not an "exceptional case" in the sense contemplated by Congress. This is not a case in which defendants acted fraudulently, maliciously or in bad faith. This is a classic case of two competitors, in a tight, highly competitive market in which the technology changes rapidly. It appears from the evidence that each of the parties made calculated efforts to advertise their products at the outer limits of their supportable qualities, as competitively and as close to the edge as the law permits.

In this case, the evidence shows that defendants overstepped the bounds of permissible competition. Defendants did not disseminate these false advertising claims by accident; they did it purposefully. But the record does not support a finding that defendants' intent rose to the level of bad faith which would justify imposition of attorneys' fees. Defendants have made good faith efforts to seek advice from knowledgeable persons concerning their product. Warner–Lambert has conducted tests to determine the supportable features of New E.P.T. Plus and has reviewed carefully the data collected. It also has attempted to qualify the advertising claims to render them truthful yet competitive. Therefore, attorneys' fees are not awarded in this case. Of course, Tambrands is entitled to costs.

## CONCLUSION

Because I find that defendants' advertising claims for New E.P.T. Plus as described above are facially false, defendants are permanently enjoined from using these claims in their advertising. Tambrands is awarded costs and denied attorneys' fees.

A permanent injunction shall be settled on notice within five days of the date of this opinion.

SO ORDERED.