**UNIVERSAL CITY STUDIOS, INC., Plaintiff,**

**v.**

**NINTENDO CO., LTD. and Nintendo of America, Inc., Defendants.**

**No. 82 Civ. 4259 (RWS).**

United States District Court, S.D. New York.

Dec. 22, 1983.

Townley & Updike, New York City, for plaintiff; Douglas C. Fairhurst, Mary D. Faucher, Sandra Edelman, New York City, of counsel.

Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, Sax & Maciver, Seattle, Wash., for defendants; James L. Magee, Seattle, Wash., John J. Kirby, Jr., Thomas G. Gallatin, Jr., Shelley B. O'Neill, Catherine E. Palmer, New York City, of counsel.

SWEET, District Judge.

This is a dispute over two gorillas. Defendants Nintendo Co., Ltd., a Japanese corporation, and Nintendo of America, Inc. (referred to herein collectively as "Nintendo"), have moved for summary judgment to dismiss the trademark and unfair competition complaint of plaintiff Universal Studios, Inc. ("Universal"), a California corporation which seeks to enforce certain rights with respect to King Kong.

Nintendo's gorilla appears in a video game named "Donkey Kong." In the game, described in greater detail below, the player manipulates a little man past numer-

ous obstacles and up a series of ramps on a structure, at the top of which stands a large gorilla holding a pretty girl. Nintendo manufactured, distributed and sold the game in the United States. The game was a major commercial success.

Universal claims that its gorilla is King Kong. Exactly who King Kong is, in the trademark sense, and what he looks like, is a key to this lawsuit. There is, of course, a King Kong, for those expatriates and hermits who don't know, who is the central character in a famous 1933 motion picture ("the 1933 movie") produced by RKO Radio Pictures, Inc. ("RKO") and in a remake of that motion picture (the "1976 remake") done by the Dino DiLaurentiis Corporation ("DDL") in 1976. Universal does not claim to own a trademark in these images of King Kong, but instead claims to be the owner of a trademark in the King Kong name and another King Kong character by virtue of certain recent assignments.

For the reasons set forth below, I conclude that summary judgment is appropriate and the complaint will be dismissed.

### Prior Proceedings

In April 1982, Universal brought this suit claiming that Donkey Kong because of its similarity to King Kong violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as section 368–d of the New York General Business Law (the antidilution statute) and related state causes of action. This occurred some nine months after Nintendo had commenced marketing its extremely successful game. Discovery was thereafter completed. Universal did not seek preliminary injunctive relief against the alleged infringement. The action is ready for trial.

A hearing was conducted on August 8, 1983 on the motion for summary judgment during which "Donkey Kong" was demonstrated by a game master and pertinent parts of the 1933 movie and the 1976 remake were reviewed, an altogether satisfying court day enhanced by the argument of highly skilled and forceful counsel and marred only by the submission of affidavits, depositions and briefs. Upon these proceedings the following findings and conclusions are reached.

### The Issues

Nintendo has moved to dismiss the action on the grounds that: (1) Universal is precluded from asserting trademark rights in King Kong by the doctrines of collateral and judicial estoppel, because the issues in this action were fully litigated in a previous action in federal court in California during 1975–81; (2) the documents resulting from the California litigation do not, as a matter of law, successfully convey a trademark to Universal; (3) Universal cannot claim a trademark in King Kong because the multiple origins and present uses of King Kong have made it impossible for King Kong to denote a single source of origin, which is the necessary function of a trademark; and (4) as a matter of law, there is no likelihood of confusion as to the source of Donkey Kong, and Universal's agreements with the Nintendo licensees constitute an abandonment of any trademark claim to King Kong and alternatively constitute an admission that Donkey Kong is not an infringement. In addition, Nintendo seeks summary judgment dismissing Universal's claim under the New York antidilution law.

### Facts

#### King Kong

The King Kong story first appeared in public with its publication in 1932 as a book and a magazine serial. Merian C. Cooper was the originator of the story that was the basis for the book and magazine serial. His son and heir, Richard Cooper ("Cooper") now holds the exclusive book publishing rights with respect to King Kong, including the right to make, distribute or license novels, comic books or magazine articles using the King Kong name, character and story.

In 1933, RKO released the first King Kong motion picture. The screenplay for the 1933 movie was co-authored by Merian Cooper, and was based on the story which

was also the basis of the book and the magazine. The 1933 movie has become an American classic, and the parties agree that its scenes, especially the one in which King Kong stands on top of the Empire State Building holding Fay Wray captive, are recognized by the American public and need no description here for the benefit of the parties or the reviewing authorities.

RKO continues to hold the exclusive copyright to the 1933 movie and all depictions of King Kong in it. From 1933 until 1979, RKO and 15 licensees used and advertised the King Kong name, character and story in many products, including toys, games, books and garments. These merchandising activities were unsupervised and unchallenged. Over the same period, there have also been published and commercial uses of the term "King Kong," and variations on it and of the King Kong character and image, as well as third-party trademark registrations of the "King Kong" name and variations on it, all without reference to the makers of the movie. The term "King Kong" is now defined in various dictionaries and listed in some editions of Roget's Thesaurus.

In 1975, amidst a dispute involving RKO, Universal and DDL as to who could produce a remake of King Kong, Universal brought suit in California state and federal court to resolve this question. The dispute began when RKO, the maker of the original 1933 movie, licensed DDL to remake the picture. Universal, claiming that RKO had promised in negotiations to license Universal to remake the picture, sued RKO and DDL in California state court for breach of contract and tortious interference with contractual relations. That action was ultimately settled.

While Universal was pursuing its contract claim in state court, it began to produce its own King Kong remake in August 1975. It also commenced a declaratory judgment action in California Central District federal court against RKO, DDL and Cooper, No. 75–3526, seeking, among other things, a declaration that the copyright on the King Kong story had lapsed, that the story was thus in the public domain, and that Universal might produce a new King Kong movie without infringing on any rights of RKO and DDL.[1] RKO answered that Universal was not entitled to infringe on RKO's copyright and related rights in King Kong. In addition, RKO counterclaimed, alleging Universal's planned remake would infringe RKO's King Kong copyright and would constitute unfair competition by, among other things, diluting RKO's rights in the King Kong title and character.[2] Universal's reply denied these counterclaims.

---

1. The Universal complaint contended:
 That the Mystery Magazine serialization and the King Kong novel and all the Old Material contained therein are in the public domain; and
 That Universal may produce, sell, distribute and exhibit a motion picture photoplay based primarily on the Old Material contained in the Mystery Magazine serialization and the King Kong novel, as long as it does not contain New Material, if any, from the King Kong photoplay; and such a motion picture photoplay produced by Universal will not infringe upon the claimed rights of defendants, or any of them, in the King Kong photoplay, or any alleged rights in the King Kong novel, or any other alleged rights of defendants.

2. RKO's counterclaim contended that:
 UNIVERSAL has publicly announced, stated and represented, in the press, in these proceedings, and elsewhere, that it plans and intends to produce, sell, distribute, and exhibit throughout the world, a motion picture photoplay slavishly copying RKO's said copyrighted motion picture photoplay KING KONG, featuring the character KING KONG, and utilizing the name KING KONG as the title or part of the title thereof. RKO has duly objected to said plans of UNIVERSAL, but to the best of RKO's information and belief, UNIVERSAL is going forward with said production.
 ... RKO has entered into a written agreement with defendant DINO DeLAURENTIIS CORPORATION ("DeLAURENTIIS") exclusively licensing it to produce and distribute a new version, or remake, of KING KONG in consideration of a percentage of the gross receipts from the exhibition thereof.
 By issuing said announcements, statements, and representations, UNIVERSAL: has slandered and called into question RKO's rights in its said copyrighted motion picture photoplay and the component parts of title thereof; has diluted the RKO's rights and the value thereof in said copyrighted motion picture photoplay,

DDL also answered and counterclaimed contending, among other things, that the King Kong name and character had acquired a secondary meaning and that Universal's King Kong production would constitute wrongful appropriation of the King Kong name and character and the associated rights. Again, Universal's reply to the counterclaim denied that the name and character had any secondary meaning. (DDL's counterclaim was later dismissed with prejudice by stipulation). Defendant Cooper, in addition to denying that the "King Kong" story had fallen into the public domain, cross-claimed against RKO, claiming, among other things, that he was the successor to his father's rights in King Kong. Cooper also claimed that his father's contract with RKO allowed RKO to make only the 1933 movie, and that, because of this limited grant of rights, all other commercial exploitation of the King Kong name, character and story by RKO were for Cooper's account.

After a four-day trial before District Judge Real, the Court, on November 24, 1976, held (the "First Judgment") that the King Kong story was in the public domain, that Universal could make a movie based on King Kong so long as it did not infringe on the copyrighted 1933 King Kong movie and that RKO's counterclaim was dismissed on the merits. On the same date that this judgment was entered, the Court entered certain findings of fact and conclusions of law, including the following:

1) There is no evidence that the title "King Kong" has a secondary meaning by which the public identifies such title with RKO or the motion picture.

2) The name "King Kong" has become part of the ordinary English language.

On December 6, 1976, the Court signed an interlocutory judgment for Cooper on his cross-claim (the "Cooper Judgment"). The Court held that:

> the title thereof, and the character KING KONG; and has interfered with RKO's prospective economic advantage under said written agreement with DeLAURENTIIS, all to RKO's damage in a sum as yet unascertained but believed to be in excess of $5,000,000.00.

1) As between RKO and Cooper, all rights in the name, character and story of King Kong, other than the rights in the 1933 movie and the sequel "Son of Kong" are vested in Cooper.

2) RKO is a constructive trustee for Cooper to the extent it has exercised rights to King Kong other than in the 1933 movie and "Son of Kong."

3) Cooper recover from RKO all profits earned by RKO in its trustee capacity.

4) This interlocutory judgment does not affect the court's finding that the King Kong story is in the public domain.

After the entry of this judgment, Cooper and Universal reached an agreement (the "Cooper-Universal Assignment") and for $200,000 Cooper assigned to Universal all his rights in King Kong.

RKO appealed the First Judgment to the Ninth Circuit Court of Appeals, No. 77–1518. But before the Court ruled, Universal and RKO entered into a settlement agreement (the "Universal-RKO Agreement"), in which RKO agreed to pay Universal roughly 62.5% of the revenues RKO realized from the DDL remake. RKO also agreed not to sue Universal for any King Kong movie Universal might make, but Universal agreed to pay RKO a small percentage of net profits from any such remake. RKO and Universal also agreed not to sue each other because of any claim arising out of the state or federal actions.

The Court of Appeals, after being advised of these agreements, dismissed RKO's appeal, vacated the First Judgment and the Cooper Judgment and remanded to the district court to determine which actions were moot by reason of the settlements, and enter dismissals or new judgments as appropriate. In a November 19, 1980 order on stipulation, Universal's com-

> If UNIVERSAL is not enjoined from continuing to make such announcements, statements, and misrepresentations, RKO's said rights will be further demeaned and diluted and its prospective economic advantage further diminished, all to its irreparable injury.

plaint against RKO was dismissed without prejudice and RKO's counterclaim was dismissed with prejudice. On January 5, 1981, the district court reinstated the March 21, 1979 judgment entered for Cooper on his cross-complaint against RKO. The 1979 judgment, which had been assigned to Universal, incorporated the findings of fact and conclusions of law described above to the effect that the Cooper Judgment did not affect the Court's finding that the King Kong story was in the public domain.

While this litigation was proceeding, in December 1976, Paramount Pictures Corp. ("Paramount"), amidst heavy promotion, released the DDL remake of King Kong, which was licensed by RKO. More than 25 million people saw it. Later, in 1977, Paramount and DDL obtained a preliminary injunction against the release of "APE," a movie the court held likely to be confused with the 1976 remake. *Paramount Pictures Corp. v. Worldwide Entertainment Corp.*, 195 U.S.P.Q. 539 (S.D.N.Y.1977). From 1976 through 1979, Paramount, under controlled licensing agreements with DDL and RKO, used the King Kong name and character in connection with the sale of numerous consumer products, such as school supplies, wristwatches, dolls, games, toys and articles of apparel. DDL holds the exclusive copyright to the 1976 remake.

Universal acquired whatever rights it has in King Kong by means of the Cooper-Universal assignment. Because of RKO's outstanding King Kong licensing arrangements with DDL and Paramount, Universal did not begin to exploit the King Kong name and character until approximately December 1980. In that month, Universal, through its merchandising subsidiary, Merchandising Corporation of America ("MCA"), granted its first license authorizing the use of the King Kong name and character for the sale of costumes. Universal derived about $3,300 from the license, which was with Ben Cooper, Inc. Subsequently and before this lawsuit was brought, MCA licensed Tiger Electronic Toys, Inc. ("Tiger") to develop and sell King Kong tabletop and handheld video games. Universal has received $39,000 from the sale of those products, which bear the King Kong trademark. Universal has also licensed National Electronics & Watch Co. Ltd. to use the King Kong name in the promotion and sale of wristwatch games. That license runs through December 31, 1984. The revenues Universal has received from this license have not been indicated to the court. In addition, in April 1983, Universal authorized Robert Keith & Co. for a fee of $1,000 to display a King Kong gorilla balloon on top of the Empire State Building in conjunction with the Building's 50th anniversary celebration of the 1933 movie. Finally, Universal is developing a King Kong tour attraction which will become part of the Universal Studios Tour in California, and plans to develop a similar King Kong tour attraction at Universal's Florida tour facility.

In other instances, businessmen seeking licenses for uses of King Kong have been confused over who owns the rights to King Kong. According to the deposition testimony of RKO executive William M. Regan, when the licensee referred to above sought to put a King Kong balloon atop the Empire State Building, the licensee, RKO and Universal were unsure whether RKO or Universal had the right to grant the license. Similarly, when another potential licensee first approached Universal to license King Kong for use in an advertisement, Universal referred the licensee to RKO, but RKO executives did not know whether they had the exclusive right to license the use and the licensee apparently gave up trying to get the license.

### Donkey Kong

Nintendo Co., Ltd., the Japanese parent, is engaged in the manufacture, assembly and sale of arcade and hand-held video games, as well as other games. Nintendo of America, Inc. imports, assembles, manufactures and sells arcade and table-top video games and imports hand-held video games.

Nintendo's development of Donkey Kong began in March 1981. In the design

stages, the original game concept involved a port scene, and featured the Popeye cartoon characters—Popeye, Bluto and Popeye's girlfriend, Olive Oyl. Because it was determined that it was not technically possible to present the Popeye characters on the video screen, the characters Popeye and Bluto were replaced with "Mario the Carpenter" and a comical gorilla, and the port scene was changed to an unfinished building.

The name "Donkey Kong" was selected for the game through an informal process. The word "kong" was adopted because it was believed to be readily understandable as denoting a gorilla; the word "donkey" was derived by consulting a Japanese/English dictionary which gave the word "donkey" as a translation for a Japanese word meaning stupid or "goofy." Shigeru Miyomoto, the Nintendo employee who designed Donkey Kong, testified by deposition that he had seen King Kong movies, and that he referred to the Donkey Kong gorilla as "King Kong" while designing the game.

The object of the Donkey Kong game is for the player to maneuver Mario the Carpenter up an unfinished girdered structure to rescue a girl from the gorilla at the top. To reach the top, Mario must run up ramps, climb ladders, jump on moving construction elevators and ride conveyor belts while avoiding obstacles such as cement tubs, foxfires, barrels, and beams rolled down the structure by Donkey Kong. Mario wins such prizes as telephones, umbrellas, lunch pails and birthday cakes on his way. At the top of the unfinished structure, Donkey Kong struts back and forth and jumps up and down.

In July 1981, the Donkey Kong game was introduced into the United States market. The game was a major commercial success. Nintendo has received over $180 million from the sale in the United States and Canada of approximately 60,000 Donkey Kong video arcade games. Nintendo has licensed its trademark in the Donkey Kong name and characters to over 50 licensees for use in connection with a large variety of products and has received over $8.5 million in royalties for such licenses. Major licensees include Atari, Inc. ("Atari"), Coleco Industries, Inc. ("Coleco"), Ruby-Spears Enterprises, Inc. ("Ruby-Spears") and Ralston Purina Company. Nintendo has also developed and now markets video arcade games called "Donkey Kong Junior" and "Mario Brothers," based on the characters made popular in the original Donkey Kong game. In addition, Nintendo has developed and now markets handheld video games called "Donkey Kong," "Donkey Kong II", "Donkey Kong Junior" and "Mario Brothers." Nintendo also manufactures and sells tabletop video games named "Mario's Cement Factory" and "Donkey Kong Junior."

Universal sought to enforce its rights against the Nintendo licensees. Atari, Coleco and Ruby-Spears settled Universal's claims against them over their use of Donkey Kong by agreeing to pay royalties to Universal amounting to several million dollars for Universal's covenant not to sue. In return, the Coleco and Atari agreements gave Universal a three percent royalty and the Ruby-Spears agreement gives Universal royalties as well as the right to distribute Donkey Kong programs produced off-network throughout the world, including pay and cable television, video discs and casettes. Universal does not control or supervise any of the three licensees' exploitation of Donkey Kong.

The Donkey Kong products are labeled to indicate their source of origin from Nintendo. The exteriors of the cabinetry of the Donkey Kong video arcade games display Nintendo's copyright notice "(c) 1981 Nintendo of America, Inc." and display prominently the name "Donkey Kong (TM)" with the notation "Nintendo (TM)." Prior to insertion of a coin in the game, the video screen displays an "attract mode" (to attract players to the game), which shows the name "Donkey Kong (TM)" and the copyright notice "(c) 1981 Nintendo of America Inc." Licensed Donkey Kong products are also labeled to indicate their source of origin from Nintendo.

A survey conducted for Universal by Opinion Research Corporation in March of this year asked video arcade owners and operators who had purchased the Donkey Kong game (a) why they thought the game was called Donkey Kong and (b) whether they believed Donkey Kong was sold with the approval or under the authority of those responsible for the King Kong motion pictures. Eighteen percent of the survey audience said they believed that Donkey Kong had been sponsored or authorized by the King Kong motion picture makers. Universal has submitted articles from video industry books and magazines, containing such statements as "Inarguably, the most visible of Donkey Kong's predecessors is King Kong and his movie kin." and referring to Donkey Kong as "a video version of the film classic *King Kong.*"

Neither Universal nor Nintendo have submitted evidence regarding confusion between King Kong and Donkey Kong by consumers who buy and/or play video games or the degree of sophistication of those consumers.

### Discussion

I. *Collateral and Judicial Estoppel*

Nintendo's collateral estoppel argument relies on three judgments:

1) the First Judgment;

2) the Cooper Judgment in its final, 1981 form; and

3) the November 19, 1980 order on stipulation.

■ The collateral estoppel argument based on the first and second judgments can be rejected without great difficulty. The reason the First Judgment lacks collateral estoppel effect is that it was vacated by the Court of Appeals. *See Quarles v. Sager,* 687 F.2d 344, 346 (11th Cir.1982); 1B J. Moore, *Moore's Federal Practice* ¶ 0.416[2] at 2231 ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel.").

■ Nintendo maintains, however, that the substance of the First Judgment survived by means of the Cooper Judgment, because the Final Judgment's "terms are clearly reflected in the reinstated Cooper Judgment." The Cooper Judgment does no such thing, however. The only support Nintendo provides for this view is the statement in the Cooper Judgment, (which held, *inter alia,* that the King Kong story was in the public domain), that that judgment did not "affect any other entity or person." This caveat failed to reinstate a previously vacated judgment.

■ Nintendo also claims that the Cooper Judgment has collateral estoppel effect of its own. The Cooper Judgment, unlike the First Judgment, was reinstated after its having been vacated by the Court of Appeals. It thus is capable of having collateral estoppel effect. However, the holding of the Cooper Judgment cannot have collateral estoppel effect against Universal in this suit because it is not relevant to the issues raised by this suit. The only holding of the Cooper Judgment that might be relevant to Universal's current suit is the Court's finding of fact that the King Kong story was in the public domain. However, although this finding is relevant to whether a work has been copyrighted, it is not dispositive of the trademark issue. *See Frederick Warne & Co., Inc. v. Book Sales, Inc.,* 481 F.Supp. 1191, 1196 (S.D.N.Y.1979) ("The fact that a copyrightable character or design has fallen into the public domain should not preclude protection under the trademark laws ...."); Adams, *Superman, Mickey Mouse and Gerontology,* 64 Trade-Mark Rep. 183, 188–89 (1974); note 6 *infra.*

■ Nintendo's third argument for collateral estoppel—based on the November 19, 1980 order on stipulation—is more persuasive. That order dismissed Universal's claim against RKO without prejudice and dismissed RKO's counterclaim with prejudice. It thus might be taken to be a judicial declaration that RKO's trademark counterclaim lacked merit, and that thus the trademark to which Universal alleges it

succeeded did not exist. That order, however, is too slender a reed to provide for collateral estoppel for it is not clear that Universal and RKO intended the consent judgment to have collateral estoppel effect.

■ When a judgment has been entered on consent, the demonstration of such intent by the parties is a prerequisite to the giving of collateral estoppel effect. *See Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 539 (5th Cir.1978) ("If [the parties to a consent decree] have in their compromise indicated clearly the intention that the decree to be entered shall not only terminate the litigation of claims but, also, determine finally certain issues, then their intention should be effectuated."); 1B Moore ¶ 0.444[1] at 4003–04, ¶ 0.444[3] at 4022–24; 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4443 at 388 ("Preclusion is appropriate if it is clear the parties intended it …").

■ Whether the consent judgment is accompanied by findings of fact is especially relevant to the determination of the parties' intent. In *Lawlor v. National Screen Service*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), the Supreme Court declined to give collateral estoppel effect to a settlement agreement between the parties then before the Court because the consent judgment "was unaccompanied by findings and hence did not bind the parties on any issue … which might arise in connection with another cause of action." *Id.* at 327, 75 S.Ct. at 868. In support of this holding, the Court quoted *United States v. International Building Co.*, 345 U.S. 502, 503, 505, 73 S.Ct. 807, 808, 97 L.Ed. 1182 (1953), in which collateral estoppel effect was denied to a consent judgment, because that judgment was

> only a *pro forma* acceptance by the Tax Court of an agreement between the parties to settle their controversy for reasons undisclosed. There is no showing either in the record or by extrinsic evidence … that the issues raised by the pleadings were submitted to the Tax Court for determination and determined

by that court. They may or may not have been agreed upon by the parties. Perhaps, as the Court of Appeals inferred, the parties did agree on the basis for depreciation. Perhaps the settlement was made for a different reason, for some exigency arising out of the bankruptcy proceeding. As the case reaches us, we are unable to tell whether the agreement of the parties was based on the merits or on some collateral consideration.

*Id.* 349 U.S. at 327 n. 12, 75 S.Ct. at 868 n. 12. *See also American Heritage Life Insurance Co. v. Heritage Life Insurance Co.*, 494 F.2d 3, 8–9 (5th Cir.1974). The consent judgment on which Nintendo relies does not contain any findings of fact. It is merely a judicial ratification of a settlement of the Universal-RKO dispute.

However, Nintendo attempts to save the consent judgment by arguing that the findings of fact underlying the Cooper Judgment are sufficient to give the consent judgment collateral estoppel effect. As was shown above, however, those findings relate only to a copyright issue, not to the trademark issue on which Nintendo claims the consent judgment has collateral estoppel effect. As a result, Universal's and RKO's intent in settling their dispute cannot be determined with sufficient clarity to allow that settlement to have collateral estoppel effect. As the Supreme Court said in *Lawlor, supra*, "As the case reaches us, we are unable to tell whether the agreement of the parties was based on the merits or on some collateral consideration." For this reason, Nintendo's argument for summary judgment because of collateral estoppel is rejected.

■ As a related argument, Nintendo contends that Universal should be precluded from asserting trademark rights in King Kong by the doctrine of judicial estoppel, in which "a party may be precluded by a prior position taken in litigation from later adopting an inconsistent position in the course of a judicial proceeding." 1B Moore ¶ 0.405[8] at 765. Leaving aside the question of the vitality of this doctrine in this Circuit or

elsewhere [3], the doctrine would not apply here in any case because the courts that have applied the doctrine have required that "success in the prior proceeding is clearly an essential element of judicial estoppel," *Konstantinidis v. Chen*, 626 F.2d 933, 939 (D.C.Cir.1980) (citations omitted), and a "settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel." *Id.* (citations omitted). *Accord, Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595, 598–99 (6th Cir.1982); *City of Kingsport, Tenn. v. Steel and Roof Structure, Inc.*, 500 F.2d 617, 620 (6th Cir.1974). *See also Gottesman v. General Motors Corp.*, 222 F.Supp. 342, 344 (S.D.N.Y.1963). Universal's dispute with RKO was settled. For this reason, the doctrine of judicial estoppel does not apply to this dispute.

## II. *The Validity of Universal's Trademark*

Nintendo has challenged the validity of Universal's trademark in King Kong on two grounds. The first is that the documents from which Universal claims to derive ownership of the trademark fail to convey that trademark. The second ground is that King Kong lacks secondary meaning, the fundamental requisite of a § 43(a) trademark.

### A. *Universal's Chain of Ownership*

The first of these two arguments is that the documents resulting from the California litigation do not, as a matter of law, successfully convey a trademark to Universal. This argument raises no disputed facts concerning the documents. Its resolution requires merely that the court decide the legal effect of the chain of ownership on which Universal relies. It is thus appropriate for summary judgment, which is granted for the reasons given below.

Universal's claim of ownership of the King Kong trademark derives from two documents: the Cooper Judgment and the Cooper-Universal Assignment. The Cooper Judgment, entered on December 6, 1976 and discussed above, stated that, as between RKO and Cooper, all rights in the King Kong name, character and story were vested in Cooper, and that to the extent RKO had exercised these rights in the preceding years, it had done so as a constructive trustee for Cooper and would have to pay to Cooper all profits it had earned in this trustee capacity. Shortly after the Cooper Judgment had been entered, in the Cooper-Universal Assignment signed on December 15, 1976, Cooper assigned to Universal all of his rights in the King Kong name, character and story, for $200,000. In Universal's view, then, the King Kong trademark's lineage is as follows. RKO created the King Kong trademark over the period from the 1933 movie's release until 1976 by granting merchandising rights in the King Kong name, character and story. On December 6, 1976, Judge Real held that Cooper, not RKO, owned the rights to this trademark. Then, on December 15, 1976, Cooper sold these rights to Universal, and it is these rights which Nintendo is alleged to have infringed.

Nintendo challenges this lineage, maintaining that trademark rights, such as those Universal claims in King Kong, cannot be bought and sold in the abstract, and that they may be transferred only by means of a controlled licensing program or along with the product they identify or the assets or goodwill of the business that developed them. Because the transfer of the King Kong trademark from RKO to Cooper did not comport with these require-

---

**3.** There is considerable uncertainty as to the source and strength of the doctrine. *See Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C.Cir. 1980) ("judicial estoppel has not been followed by anything approaching a majority of jurisdictions, nor is there a discernible modern trend in that direction.") *Parkinson v. California Company*, 233 F.2d 432, 437–38 (10th Cir.1956) (judi-

cial estoppel "reflects the minority viewpoint which has encountered inhospitable reception outside the state of Tennessee.") *But cf. Sperling v. United States*, 692 F.2d 223, 227–29 (2d Cir.1982) (Van Graafeiland, J., concurring), *cert. denied,* —— U.S. ——, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983).

ments, according to Nintendo it was an invalid transfer. As a result, Cooper had no King Kong trademark rights on December 15, 1976 when he sold all of his King Kong rights to Universal. In response, Universal contends that trademark rights can be transferred by operation of law, as they are in bankruptcy proceedings, and thus the Cooper Judgment transferred RKO's trademark rights to Cooper.

 Nintendo's analysis of the nature of a trademark is correct. Trademark rights do not exist in the abstract, to be bought and sold as a distinct asset. They exist only in connection with a business or a product and can be transferred only along with that product or business or its goodwill. The Supreme Court has explained:

> The asserted doctrine is based upon the fundamental error of supposing that a trademark right is a right in gross or at large .... There is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed. ... the right to a particular mark grows out of its use, not its mere adoption, its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business.

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed. 141 (1918). *See also American Footwear Corp. v. General Footwear Co., Ltd.*, 609 F.2d 655, 663 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (citing *United Drug*). Because a trademark is not a right in gross, it cannot be transferred except by means of a supervised license or in connection with an ongoing business or some aspect of that business. *See Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (Cust. & Pat.App.1978) (transfer invalid as an assignment in gross because there was no evidence that transfer of goodwill ac-

companied purported transfer of the mark); 3 R. Callmann, *The Law of Unfair Competition Trademarks and Monopolies* § 19.-39 at 175 ("where there is no transfer of all or any part of a business, nor control over a license with respect to the nature and quality of goods or services [citation omitted], the purported assignment or license is 'naked,' and therefore invalid [citations omitted]."); E. Vandenburgh, *Trademark Law and Procedure* § 8.10 at 187–89 (1959 and 1979 Supp.). This rule is no less valid where the trademark is in a character name. *See* Brylawski, *Protection of Characters—Sam Spade Revisited*, 22 Bull. Copyright Soc'y U.S.A. 77, 82–83 & n. 29 (1974). Because the trademark transfer from RKO to Cooper was not accomplished by either of the two permissible methods— by a supervised license or along with a sale of business assets or goodwill—that purported transfer would seem to be invalid.

Universal does not dispute this view of trademark law, but contends that trademark rights can also be transferred by operation of law, as they are in bankruptcy proceedings and cites *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866 (E.D.N.Y.1978) and Callmann, *supra*, § 19.-61 at 241–45. But *Johanna* does not help Universal. In *Johanna*, plaintiffs had sued for an injunction and damages against defendants' allegedly infringing use of a trademarked name for orange and grapefruit juice. One reason plaintiff cited for its argument that defendants did not own the trademark was that defendants had acquired the mark as a transfer in gross at a bankruptcy sale. The court rejected this argument because there was sufficient evidence that the mark had been sold along with the physical assets and goodwill of the bankrupt's business. In so holding, the Court stated:

> As correctly noted by the plaintiff, a similar yet distinct defense of abandonment arises when a Trustee in Bankruptcy attempts to assign a trademark without the corresponding transfer of the good will which the mark symbolizes .... In such a case, the transferor may

possess the genuine intent to maintain the viability of the mark, but if he transfers the mark without the concomitant good will, his good intentions will not breathe life back into the devitalized mark. Such an inescapable fate arises from the nature of a trademark. Since a trademark must be appurtenant to some enterprise to which it is related, if the mark and the goodwill are separated by the Trustee, whether purposefully or inadvertently, the goodwill is abandoned and the underlying rights are destroyed. The net result of such a transfer is a transfer in gross which in trademark law is tantamount to an abandonment.

468 F.Supp. at 879. Callmann, *supra*, states the same rule: "as in all other transfers of trademarks and trade names [a bankruptcy transfer] is invalid without the concurrent supporting transfer of the goodwill symbolized by the trademark." *Id.* § 19.61 at 241–42. *See also* Vandenburgh, *supra*, at 191.

 Although the Cooper Judgment made RKO a constructive trustee for Cooper and required RKO to give Cooper all profits it had earned from the use and licensing of King Kong, it did not successfully transfer RKO's trademark rights to Cooper. Universal's view of the Cooper Judgment is an attempt to validate the quintessential transfer in gross—a transfer of a trademark without any other aspect of RKO's business. Trademark rights are fragile; they do not exist in the abstract, but only because of the public's association of them with a particular product or business. Exactly what Cooper sold Universal in the Cooper-Universal Assignment is not clear. However, because Cooper never owned the King Kong trademark, he could not have sold it to Universal. Universal thus does not own a trademark in King Kong, and summary judgment for defendant is appropriate for this reason.

## B. *Secondary Meaning for King Kong*

 In addition, Universal's King Kong lacks secondary meaning as a matter of law—an independent argument for summary judgment. Because of the competing property interests in King Kong, and considering third-parties' unauthorized use of King Kong trademarks for various products, King Kong no longer signifies a single source of origin to consumers and thus is not a valid trademark.

Universal has contended that trademark law does not require that consumers know *who* the source of a trademarked product is, that the competing property interests in King Kong are copyright interests and thus do not conflict with Universal's trademark right, and that the third-party registrations of King Kong trademarks do not prove actual use of or consumer familiarity with those trademarks, and in any event do not destroy Universal's trademark because "an infringement cannot be justified by the wrongful acts of others."

### 1. *Competing Property Interests*

 To make a successful claim of false designation of origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Universal must demonstrate that its trademark possesses "secondary meaning"—"[t]he power of a name or other configuration to symbolize a particular business, product or company ...." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 n. 5 (2d Cir.1979). This is because "It is elementary that the function of a trademark is to indicate the origin of the products to which it is attached." *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 269 (2d Cir.1968). For secondary meaning to exist, the public need not know the name of the manufacturer which produces the trademarked product, but the public must be aware that the product derives from a *single* source. *Processed Plastic Co. v. Warner Communications, Inc.*, 675 F.2d 852, 856 (7th Cir.1982). *See also Dallas Cowboys, supra,* 604 F.2d at 203 n. 5 (trademark must "symbolize a *particular* business, product or company." [emphasis added] ).

It is this requirement—that a trademark indicate to consumers a single source of origin—that is fatal to Universal's claim.

The current holdings of rights in King Kong are:

1. RKO owns the 1933 movie and its sequel, including the right to use or license stills and footage from these movies.

2. Cooper owns the worldwide book and periodical publishing rights to King Kong.

3. DDL owns the 1976 remake, including the right to use or license its stills and footage.

Exactly what shred of the King Kong character and name Universal owns is far from clear. Under the Cooper-Universal Assignment, Universal owns everything the Cooper Judgment gave Cooper except the rights Cooper reserved in the Cooper-Universal Assignment. Universal thus owns only those rights in the King Kong name and character [4] that RKO, Cooper, or DDL do *not* own. The closest Universal has come to defining its trademark is the following: "it denotes a *particular* gorilla, one who happens to be extraordinarily large and who holds a female captive on top of a large building." Plaintiff's *Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment* 36. Essentially, Universal claims to own a trademark in an extraordinarily large gorilla standing on top of a tall building holding a woman captive. Yet this gorilla must be distinct in image and characteristics from the copyrighted black-and-white photograph of the original 1933 King Kong, an enormous gorilla holding Fay Wray captive on top of the Empire State Building. And Universal's gorilla must somehow be distinguishable from the copyrighted still of a giant gorilla holding a woman on top of the World Trade Center in the 1976 remake.

With these specific images foreclosed, Universal is left merely with the remaining rights in the King Kong character. Universal's own explanation of its rights is an indication of the vagueness of Universal's mark: "Universal has the right to license ... pictures of the King Kong gorilla designed by Universal ...." *Universal Mem.* 98. The vagueness of the image in which Universal claims a trademark right violates the fundamental purpose of a trademark: to identify the source of a product and thereby prevent consumer confusion as to that source. *See Dallas Cowboys, supra,* 604 F.2d at 203–05. Fictional characters that have gained trademark status seem generally to have been specific, narrowly defined images. *See e.g., Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 78 (2d Cir.1981) (trademark protection extends to "specific ingredients of a successful T.V. series" and thus could include an orange, 1969 Dodge Charger with a Confederate flag emblem, prominently featured on "The Dukes of Hazzard" television series); *Dallas Cowboys, supra,* 604 F.2d at 203–04 & nn. 4 & 6 (trademark in Dallas Cowboys Cheerleaders uniform, a "particular combination of colors and collection of decorations that distinguish plaintiff's uniform from those of other squads" —a uniform with "a western flavor appropriate for a Texas cheerleading squad.") A vaguely defined character lacking a specific image—indeed, one defined mainly by its *difference* from other versions of the same character—is unable as a matter of law to "achieve that fixture or consistency of representation that would seem necessary to constitute a symbol in the public mind." *DC Comics, Inc. v. Filmation Associates,* 486 F.Supp. 1273, 1277 (S.D.N.Y.1980).

---

**4.** At times Universal has referred to its rights in the King Kong story in addition to those in the name and character. However, the statute under which Universal brings its trademark claim does not permit the trademarking of a story. *See* 15 U.S.C. § 1125 (referring to false designations of origin by means of "words or other symbols"). The Second Circuit Court of Appeals has recently stated that "the image of a cartoon character and some indicia of that character can function as a trademark ...." *Warner Brothers, Inc. v. American Broadcasting Companies, Inc.,* 720 F.2d 231 at 246 (2d Cir. 1983) (hereafter *"Superman"*). Because no court has suggested a broader range of protection for a fictional character and because Universal has not urged on us a broader range, we will take this as the maximum range of protection available to the King Kong character.

The fatal vagueness of Universal's King Kong character is a result of a separate and equally fatal flaw in Universal's trademark claim: the conflicting ownership rights in the King Kong name and character. At this moment, RKO owns one photographic image of King Kong, DDL owns another and Universal owns some undetermined third image. Universal argues that RKO and DDL own only copyrights in their King Kong images—not trademarks—and that for this reason those rights do not present a barrier to Universal's establishment of secondary meaning in its King Kong character. However, Universal concedes—indeed, emphasizes—RKO's and DDL's extensive use and licensing of their King Kong images. Universal's position is thus that the consuming public, though confronted with extensive merchandising use of two King Kong images that represent *other* product sources, is still able to perceive that there is a distinct *third* image of King Kong that designates a *third* product source—Universal.

As has been frequently stated in this and other opinions, the purpose of a trademark—and a requirement for the statutory protection granted to trademarks—is that the mark indicate to consumers a *single* source of origin. The presence in the market of other, unrelated producers with legally protected images that are very similar to plaintiff's—indeed, whose nature defines plaintiff's mark—is fundamentally inconsistent with this requirement. *See Processed Plastic, supra,* 675 F.2d at 856 (public must assume that product comes from a "single though anonymous source"); *Black Hills Jewelry Manufacturing Co. v. Labelle's* 489 F.Supp. 754, 762 (D.S.D.1980) ("In that there are three plaintiffs [who designated their products "Black Hills Gold Jewelry," "Original Black Hills Gold Jewelry" and "Stamper's Genuine Black Hills Gold Jewelry"], there cannot be a single source of the product in question and plaintiffs are precluded as a matter of law from establishing secondary meaning."), *aff'd,* 633 F.2d 746, 749 (8th

Cir.1980) ("Neither party questions" this holding); *Avrick v. Rockmont Envelope Co.,* 155 F.2d 568, 573 (10th Cir.1946) (the consumer's "mental picture of the desired article must be sufficiently vivid to enable him to exercise the discernment and discrimination of an ordinary member of the purchasing public, otherwise the owner of the trade-marked article has not established any cognizable right to protection"); Callmann, *supra,* § 18.01 at 18–2 (mark must be "sufficiently distinct from others' marks").

The fact that the rights RKO and DDL hold to King Kong pictures are copyrights, rather than trademarks, does not save Universal. Those copyrights mean that other producers have legal rights to use other King Kong images commercially. The resulting consumer confusion is not reduced by the source of the legal protection for the competing images; indeed, a court in this District held in 1977 that the poster that advertised the 1976 DDL remake had acquired secondary meaning. *Paramount Pictures, supra,* 195 U.S.P.Q. at 542. On occasion, as described in the "Facts" section above, sophisticated businessmen have attempted to secure a license in a King Kong product and have been unable to determine which party should issue the requested license. Indeed, the recent balloon draping of the Empire State Building in King Kong's image presented just such an instance. In such a situation, casual consumers can hardly be expected to identify a single source for all King Kong products.

█ Indeed, Universal itself does not know with any precision what the nature and boundaries of its King Kong rights are. Although the existence of secondary meaning raises factual questions usually inappropriate for summary judgment, *see DC Comics Inc. v. Reel Fantasy, Inc.,* 696 F.2d 24 (2d Cir.1982), where, as here, the relevant facts are undisputed and are so extreme that no reasonable trier of fact could find that secondary meaning exists, summary judgment is proper.[5]

---

5. As support for this proposition, we note that the secondary meaning question requires the

## 2. Third-Party Uses

As further support to demonstrate that Universal's King Kong lacks secondary meaning, Nintendo points to numerous third-party trademark registrations and commercial uses of the King Kong name, or variations of it, often in conjunction with a picture of a gorilla. In response, Universal argues that (1) the registrations are not proof of use, and (2) even if the registrations have been used, they are irrelevant because "an infringement cannot be justified by the wrongful acts of others." *Friedman v. Sealy, Inc.,* 274 F.2d 255, 259 (10th Cir.1959).

■ While Universal's position may be valid as a general proposition, it is not relevant to the decision before us. Even if the third-party uses Nintendo has cited do not justify an alleged *infringement* by Nintendo, they are relevant to the showing of secondary meaning Universal must make to prevail in this claim. *See Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d 569, 572–73 n. 9 (2d Cir.1959) (plaintiff faces heavy burden in establishing secondary meaning where 33 other pink stomach remedies marketed); *cert. denied,* 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); 1 J. Gilson *Trademark Protection and Practice* (1978) § 2.09[2] at 2–82 through 2–83. However, there are third-party uses of King Kong marks whose existence Universal does not dispute, and these uses compound the problems with Universal's required demonstration of secondary meaning. While Nintendo's evidence of third-party uses is not independently sufficient

to justify the granting of summary judgment on this issue, it does strengthen our holding above that Universal is unable as a matter of law to demonstrate secondary meaning, since such uses add to consumer confusion about the source of King Kong products and make it even less likely that consumers will believe King Kong to designate a single product source.[6]

## III. The Likelihood of Confusion and the Effect of the Licensing Agreements

■ Finally, as a matter of law, there is no likelihood of confusion as to the source of Donkey Kong and by its conduct Universal has so admitted.

## A. Likelihood of Confusion

■ Even if King Kong possessed secondary meaning, contrary to the conclusions reached above, and Universal could enforce trademark rights in it, a separate question would remain, whether consumers are likely to confuse Donkey Kong and King Kong. To demonstrate infringement, Universal must show that "there exists a likelihood that an appreciable number of ordinary prudent purchasers will be misled, or simply confused, as to the source of the goods in question." *Lever Brothers Co. v. American Bakeries Co.,* 693 F.2d 251, 253 (2d Cir.1982). Although Universal correctly points out that this is primarily a question of fact, in claims under § 43(a) "courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make

drawing of factual inferences no more difficult than those involved in the likelihood of confusion issue, on which the granting of summary judgment has been affirmed by our Court of Appeals. See cases cited in Part III *infra*.

**6.** Nintendo also argues that because King Kong has become part of the English Language and because of the universality of the King Kong theme, the term cannot be a trademark. The former argument is invalid, since even words that are in the public domain may possess trademark significance. *Frederick Warne, supra,* 481 F.Supp. at 1196. *See also Superman, supra,* at 246–47 (accepting Superman as a trademark); Callmann, *supra,* § 18.01 at 18–2. As to the latter argument, the fact that Universal—or even

Merian Cooper—did not create King Kong, does not prevent King Kong from being invested with secondary meaning and thus becoming a trademark. *See Wyatt Earp Enterprises, Inc. v. Sackman, Inc.,* 157 F.Supp. 621, 623–24 (S.D.N.Y.1958) (actual, historical person's name can be trademarked). On the other hand, the commonness of the King Kong name and of gorilla imagery in general supports our conclusion above that King Kong lacks secondary meaning. *See id.* at 624 ("or it may be that a nonfanciful, real name is such a part of the national fabric that all have a measurable interest in its use, to the extent that it acquires no secondary meaning.").

the factual determination whether there is a likelihood of confusion as to source." *Warner Brothers, Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231 at 246 (2d Cir.1983) (hereafter *"Superman"*). The factors that must enter into the analysis of likelihood of confusion, *see Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), are discussed below. However, if a visual comparison reveals that the two marks are not substantially similar, summary judgment for a defendant is appropriate on this question. *See Superman, supra*, at 246; *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918 (2d Cir. 1980); *B & L Sales Associates v. H. Daroff & Sons, Inc.*, 421 F.2d 352 (2d Cir.), *cert. denied*, 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970).

The facts and disposition of *Superman* are relevant here. In *Superman*, the Court of Appeals of this Circuit affirmed the district court's granting of a motion for summary judgment in a suit for copyright and trademark infringement brought by the owners of the copyrights in various Superman works against the creators of "The Greatest American Hero" television series. In affirming the grant of summary judgment, the Court noted the extensive similarities between Superman and Ralph Hinkley, the allegedly infringing character:

> The *Hero* series contains several visual effects and lines that inevitably call Superman to mind, sometimes by way of brief imitation, sometimes by mention of Superman or another character from the Superman works, and sometimes by humorous parodying or ironic twisting of well-known Superman phrases. Hinkley's suit invests him with most of Superman's powers, and the suit, like Superman's, is a tight-fitting leotard with a chest insignia and a cape. Their outfits differ in that Superman wears a blue leotard with red briefs, boots, and cape, while Hinkley's costume is a red leotard with a tunic top, no boots, and a black cape. In one scene, as Hinkley is running at super speed, smoke emerges from his footsteps, and the sound of a locomotive is heard. A similar scene occurs in *Superman I*, though even without seeing the movie it would be difficult not to be reminded by the *Hero* scene of Superman, who is regularly described as "more powerful than a locomotive." When Hinkley first views himself in a mirror holding his costume in front of him, he says, "It's a bird ... it's a plane ... it's Ralph Hinkley." The youngster, Jerry, watching Hinkley's unsuccessful first effort to fly, tells him, "Superman wouldn't do it that way." In a scene with his girlfriend, who is aware of the powers that come with the magic costume, Hinkley says, "Look at it this way ... you're already one step up on Lois Lane. She never found out who Clark Kent really was."

*Id.* at 237. Despite these similarities, the Court found that:

> The total perception of the Hinkley character is not substantially similar to that of Superman. On the contrary, it is profoundly different. Superman looks and acts like a brave, proud hero, who has dedicated his life to combating the forces of evil. Hinkley looks and acts like a timid, reluctant hero, who accepts his missions grudgingly and prefers to get on with his normal life. Superman performs his superhuman feats with skill, verve, and dash, clearly the master of his own destiny. Hinkley is perplexed by the superhuman powers his costume confers and uses them in a bumbling, comical fashion. In the genre of superheroes, Hinkley follows Superman as, in the genre of detectives, Inspector Clouseau follows Sherlock Holmes. ... a reasonable jury could not conclude that Hinkley is substantially similar to the Superman character with only a change of name. The overall perception of the way Hinkley looks and acts marks him as a different, non-infringing character who simply has some of the superhuman traits popularized by the Superman character and now widely shared within the superhero genre.

A comparison of Donkey Kong and King Kong reveals equally great differences. Donkey Kong is comical and entertaining. The player tries to maneuver Mario the carpenter up a structure of pink girders by having him climb ladders and run up ramps, while avoiding cement tubs, barrels, beams and other obstacles. The goal of the games is to maneuver Mario to the top, where he can free a girl from the hands of a big gorilla. The farcical, childlike and nonsexual Donkey Kong creates a humorous impression by jumping up and down and strutting back and forth to tease Mario. The Donkey Kong gorilla is thus quite different from King Kong, a ferocious gorilla in quest of a beautiful woman who goes on rampages, chases people, crushes them underfoot, or throws them to the ground, and fights with dinosaurs, giant snakes, airplanes and helicopters, all culminating in his tragic and bloody death. Donkey Kong's silly obstacles of pies, cement tubs, birthday cakes and umbrellas, its prim captive girl with her hair in pigtails, and its pleasant colors and humorous sounds, create a totally different concept and feel from the drama of King Kong. At best, Donkey Kong is a parody of King Kong, but a parody of this sort is not an infringement. *Id.* at 242.

Universal has proffered evidence tending to show that Nintendo intended its gorilla character to be King Kong, as well a survey in which 18% of the video arcade operators questioned said they thought Donkey Kong had been approved by the owners of King Kong. "But if comparison of the works reveals no fair jury issue concerning likelihood of confusion, then intent to copy, even if found from the proffered evidence, would not establish a Lanham Act violation." *Id.* at 247. Similarly, "the availability of survey evidence indicating that some viewers associated the *Hero* series with Superman does not create a *reasonably* disputed factual issue of likelihood of confusion as to source when the works are as different as those in this case." *Id.* at 246. Thus, even if Universal possessed a valid trademark in King Kong, as a matter of law there is no likelihood of confusion between the two marks and summary judgment is appropriate on this ground alone.

Analysis of the likelihood of confusion under the *Polaroid* factors, *see, e.g., Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999 at 1004 (2d Cir.1983), confirms this conclusion. First, with respect to the strength of plaintiff's mark, Part II above demonstrated that Universal's mark is not distinctive and fails to identify the goods to which it is appended as emanating from a particular source. This factor weighs heavily against likelihood of confusion. *See Plus Products, supra,* at 1006. Second, with respect to similarity of Universal's and Nintendo's marks, the preceding discussion in this Part shows that, although the marks have obvious similarities, their "total concept and feel" are quite different. This factor also weighs strongly against likelihood of confusion. Third, with respect to the proximity of the products and the likelihood that plaintiff will "bridge the gap," (the closer the products are, the greater the likelihood of confusion), both marks are used on video games, although Universal's game is much less popular than Nintendo's and was introduced after Nintendo's was. In addition, Universal and Nintendo are, in a broad sense, in the same business—the provision of entertainment products and services. Fourth, with regard to actual confusion, although, in the survey described above, 18% of the video arcade operators questioned said they thought Donkey Kong had been approved by the owners of King Kong, Universal has submitted no evidence of actual confusion among consumers. This fact is especially significant considering Donkey Kong's great popularity. *See Plus Products, supra,* at 1006. Fifth, with respect to the sophistication of the buyers, no evidence has been submitted, and this factor has little weight here. Sixth, with respect to the quality of Nintendo's products, neither side has submitted direct evidence on this point, but it is worth noting that Universal, by licensing the marketing of the Coleco, Atari and Ruby-Spears Donkey Kong products, appears to have indi-

cated satisfaction with the quality of those products. Finally, with respect to Nintendo's good faith, the evidence is in conflict. On the one hand, the Nintendo employee who designed Donkey Kong called his gorilla King Kong, and had seen King Kong movies. On the other hand, Nintendo began designing the game using Popeye characters and switched to the gorilla for only technical reasons, and Nintendo chose the "Kong" name because the Japanese designers believed the word to mean "gorilla" in English. The latter facts argue against a view that Nintendo consciously sought to take advantage of the popularity of King Kong in selling its game.

I conclude as a matter of fact that the greatest weight should be given in this situation to relative strength of the marks, a factor in my view favoring Nintendo. I recognize, of course, that, contrary to the customary jury instruction concerning the weight of evidence, such weighing is also considered a determination of law. *See Plus Products, supra,* at 1004–05. Here, where almost every factor suggests that confusion is not likely, it can be said that no reasonable jury could find likelihood of confusion. For this reason, summary judgment is appropriate.

B. *The Licensing Agreements*

Universal's several agreements with Nintendo's licensees have earned substantial sums for Universal but have weakened its position in this litigation. Coleco, which sells Donkey Kong cartridges for its home video games, agreed to give Universal royalties from its cartridge sales in return for Universal's covenant not to sue. Under the terms of the agreement, Coleco has sold more than six million Donkey Kong cartridges bearing the Nintendo name but no mention of Universal. Universal secured an identical agreement with Atari concerning that company's development of a Donkey Kong game for use with home computers. Universal also reached an agreement with Ruby-Spears, which is developing a television cartoon series based on Donkey Kong, in which Universal re-

ceives royalties as well as the right to distribute the series throughout the world.

The question is whether these agreements amount to (1) uncontrolled licensing without a disclaimer, which destroys a trademark, and (2) an admission by Universal that these Donkey Kong products will not be confused with King Kong, or are (1) merely covenants not to sue, and (2) "simple settlement agreements entered into for pragmatic and compelling reasons on both sides."

 Uncontrolled licensing of a mark results in abandonment of the mark by the licensor. *Haymaker Sports, supra,* 581 F.2d at 261. *See generally* Callmann, *supra,* § 19.50 at 210–11. "The critical question ... is whether the plaintiff sufficiently policed and inspected its licensees' operations to guarantee the quality of the products they sold under its trademarks to the public." *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 367 (2d Cir.1959). *See also National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 376 F.Supp. 733, 737–39 (S.D.N.Y.), *aff'd on other grounds,* 497 F.2d 1343 (2d Cir. 1974). However, Universal maintains that the agreements are not licenses, they are merely covenants not to sue.

Whatever Universal chooses to call these agreements, they purport to authorize the use of a Universal mark. The extensive uncontrolled use of the mark indicates either Universal's abandonment of that mark or the inability of the mark to designate a single source of origin to consumers.

Viewing the agreements between Universal and the Donkey Kong licensees as settlements, their relevance is as evidence of the likelihood of confusion—evidence to be assessed in light of the details of the agreements. *See Application of E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1362–63 (Cust. & Pat.App.1973) ("It is at least difficult to maintain a subjective view that confusion will occur when those directly concerned say it won't."); *Croton Watch Co., Inc. v. Laughlin,* 208 F.2d 93, 96 (2d Cir. 1953); *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1231 & n.

45 (S.D.N.Y.1977), *aff'd,* 580 F.2d 44 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The agreements at issue here provide such evidence: Universal, now suing to prevent Nintendo from marketing its Donkey Kong arcade game, has permitted millions of other Donkey Kong products to be sold to consumers. These agreements indicate that Universal did not believe that Donkey Kong would be confused with King Kong. Although this evidence would not independently call for summary judgment on the issue of likelihood of confusion, it reinforces the court's holding above that there is no likelihood of confusion as a matter of law.

#### IV. *Anti-Dilution Statute*

 Nintendo also moves to dismiss Universal's claim under the New York anti-dilution statute, N.Y.Gen.Bus.L. § 368–d. To merit this statute's protection, "a plaintiff must first possess a trademark or name which is 'truly of *distinctive* quality' or one which has 'acquired a secondary meaning in the mind of the public.' [citation omitted.]" *Sally Gee, Inc. v. Myra Hogan, Inc.,* 699 F.2d 621, 625 (2d Cir. 1983). There is indication that the statute protects only extremely strong marks. *Id. See also Superman, supra,* at 247. In addition, a plaintiff must show sufficient similarity between the two marks to show that the allegedly infringing mark is likely to blur plaintiff's mark. *Sally Gee, supra,* 699 F.2d at 624–26.

Because we have held above that King Kong lacks secondary meaning as a matter of law, King Kong cannot qualify under the New York statute's even stricter requirements of distinctiveness. In addition, our holdings above indicate that there is no triable issue as to whether Donkey Kong blurs Universal's purported King Kong mark. *See Superman, supra,* at 247–248.

For the reasons stated above, Nintendo's motion for summary judgment against Universal's claims under § 43(a) of the Lanham Act is granted. As a separate matter, Nintendo's motion for summary judgment

against Universal's claim under the New York anti-dilution statute is granted for the reasons given above. Universal's complaint also presented claims for common-law trademark and trade name infringement and for unfair competition. These pendent state-law claims are also dismissed.

The action is dismissed and the clerk is directed to enter judgment to this effect.

IT IS SO ORDERED.